SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Stephen J. TREADWAY and Kenneth W. Corba, Defendants.

No. 04 Civ. 3464(VM).

United States District Court, S.D. New York.

May 9, 2006.

Dorothy Heyll, Jose F. Sanchez, Richard G. Primoff, U.S. S.E.C., New York, NY, Sam S. Puathasnanon, U.S. S.E.C., Los Angeles, CA, Nicolas Morgan, Rachel Lois Izower, U.S. S.E.C., New York, NY, for S.E.C.

Maxine Gail Sleeper, Alan Levine, Kronish Lieb Weiner & Hellman, L.L.P., New York, NY, for Stephen J. Treadway.

Abigail Kaufman Hemani, Adam B. Ziegler, Goodwin Procter LLP, Boston, MA, David B. Pitofsky, Richard Mark Strassberg, Goodwin Procter, LLP, New York, NY, for Kenneth W. Corba.

## DECISION AND ORDER

MARRERO, District Judge.

### TABLE OF CONTENTS

I. BACKGROUND ......................................................298

II. FACTS ...............................................................300
 A. THE PARTIES ......................................................300
 B. THE ARRANGEMENT ................................................303
 C. CANARY'S TRADING ACTIVITY .....................................307
 1. Initial Investments in Select Growth and Other Funds ..................307
 2. Trading Activity in Target, Growth and Innovation Funds; Investment in Select Growth Fund....................................308
 3. Investments in Horizon Fund and Opportunity Fund....................309
 4. Total Number of Round Trips in the Opportunity, Growth, and Target Funds ...................................................309
 5. Fees and Bonuses ..............................................310
 D. THE PIMCO FUNDS' DISCLOSURES ..................................310
 1. The Prospectus and Other Disclosure Documents ....................310
 2. Other Evidence of the PIMCO Funds' Market Timing Policies ..........313
 E. HARM TO SHAREHOLDERS AND TO THE FUNDS ....................315
 F. TERMINATION OF THE CANARY RELATIONSHIP....................317
 G. ADDITIONAL FACTS ...............................................320

III. MOTION TO STRIKE THE KOHLER DECLARATION .....................321

IV. MOTIONS FOR SUMMARY JUDGMENT .................................322
 A. LEGAL STANDARD ................................................322
 B. DISCUSSION .......................................................323
 1. Section 10(b) of the Exchange Act and Rule 10b–5 .....................323
 (a) Disputed Issues of Fact Exist As to Whether a Material Misrepresentation or Omission Was Made........................324
 (b) Material Issues of Fact Exist As to Whether Corba Made a Material Omission..............................................326
 (c) Material Issues of Fact Exist As to Whether the Misrepresentations or Omissions Were Material ..................329
 (d) Scienter .......................................................331
 (i) Treadway's Scienter .......................................332
 (ii) Corba's Scienter .........................................334
 2. Aiding and Abetting Liability ......................................336
 (a) Primary Violations .............................................337
 (i) Violations of Section 10(b) of the Exchange Act and Rule 10b–5 Thereunder by PAFM, PEA, and PAD ................337
 (ii) Violations of Sections 206(1) And 206(2) of the Investment Advisers Act by PAFM and PEA..........................338

 (b) Knowledge of the Primary Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339
 (c) Substantial Assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339
 3. Section 17(a) of the Securities Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340
 4. Section 34(a) of the Investment Company Act . . . . . . . . . . . . . . . . . . . . . . . . 340
 5. Section 36(a) of the Investment Company Act . . . . . . . . . . . . . . . . . . . . . . . . 340
 (a) Treadway . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 343
 (b) Corba . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 345
 6. Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 346

IV. ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 346

The Securities and Exchange Commission ("SEC") brought this action alleging violations of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77a et seq., Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78a et seq., Investment Company Act of 1940 ("Investment Company Act"), 15 U.S.C. §§ 80a–1 et seq., and Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b–1 et seq., by defendants Stephen Treadway ("Treadway") and Kenneth Corba ("Corba"), who served as executive officers of various investment services and mutual funds referred to as the "PIMCO Entities" or "PIMCO."[1] Pending before the Court are the SEC's and Corba's motions for summary judgment. Also pending before the Court is Corba's motion to strike the declaration of Aaron Kohler (the "Kohler Declaration") or in the alternative to compel compliance with the Federal Rules of Civil Procedure. For the reasons set forth below, the Court denies the motions of the SEC and Corba for summary judgment. The Court also denies Corba's motion to strike the Kohler Declaration.

## I. BACKGROUND

The SEC filed suit against Treadway, Corba and various PIMCO entities on May 4, 2004, alleging violations of various provisions of the federal securities laws. Familiarity with the allegations set forth in the complaint is assumed, as these were discussed at length in the Court's previous decisions denying Treadway's and Corba's motions to dismiss. *See PIMCO I*, 341 F.Supp.2d at 454; *SEC v. Treadway*, 354 F.Supp.2d 311 (S.D.N.Y.2005) (*"PIMCO II"*).[2] In sum, the SEC alleges that Treadway and Corba arranged and approved an arrangement granting Canary Capital Partners LLC special market timing privileges in its investments in certain PIMCO funds in exchange for long-term or "sticky asset" investments in other

---

1. The SEC also brought this action against various PIMCO Entities, including PIMCO Advisors Fund Management LLC, PEA Capital LLC f/k/a PIMCO Equity Advisors LLC, and PIMCO Advisors Distributors LLC. On September 13, 2004, these PIMCO Entities settled with the SEC, agreeing, without admitting or denying the allegations in the complaint, to entry of an SEC order mandating payment of a $40 million fine and $10 million in disgorgement and imposing several changes in PIMCO's governance structure intended to prevent recurrence of the alleged scheme. *See SEC v. PIMCO Advisors Fund Mgmt.*, 341 F.Supp.2d 454, 461–62 (S.D.N.Y. 2004) (*"PIMCO I"*).

2. On October 22, 2004 the Court denied Treadway's motion to dismiss, denied Corba's motion to dismiss with respect to all claims except those alleging primary violations of Section 10(b) of the Exchange Act and Section 34(b) of the Investment Company Act, and granted Corba's motion to dismiss the latter two claims without prejudice. *See PIMCO I*, 341 F.Supp.2d at 454. The SEC filed a First Amended Complaint on November 24, 2004. On January 4, 2005 the Court denied Treadway's motion for reconsideration and denied Corba's motion to dismiss portions of the First Amended Complaint which corrected deficiencies in the original complaint. *See PIMCO II*, 354 F.Supp.2d at 311.

PIMCO funds, and that this arrangement conflicted with PIMCO's public disclosures regarding market timing. While PIMCO publicly took a stance against market timing investment strategies, as reflected in both an anti-market timing statement in its Prospectus [3] as well as systematic actions taken by PIMCO employees against many investors to deter market timing, at the same time it allowed Canary Capital Partners LLC to have special market timing privileges, which was materially misleading to investors. According to the SEC, Treadway's and Corba's activities thus violated the anti-fraud provisions of the securities laws, as well as the fiduciary duties imposed on them, as executive officers of several PIMCO Entities, under the Investment Company Act and the Advisers Act.

As is to be expected, Treadway and Corba present vastly different versions of the events. These competing stories, as well as the evidence marshaled to support them, will be set forth below. In sum, however, Treadway and Corba point fingers at each other. Treadway portrays himself as an innocent victim of Corba's deceptive actions. If Treadway is to be believed, he was a staunch defender against market timing abuses in the PIMCO Entities, who was tricked by Corba into approving an arrangement that, unbeknownst to him, involved market timing. By his account, as soon as Treadway realized the truth of the matter, he took steps to limit and stop further abuses. In contrast, Corba denies any form of deception on his part, insisting that he fully disclosed the arrangement to Treadway and received his seal of approval. Even more fundamentally for purposes of his motion, however, Corba insists that he did not make any misleading statement or omission, and that he was not aware of any "disjunction" between the Prospectus and the Canary arrangement. Corba vigorously denies any responsibility for any portion of the Prospectus alleged to be misleading and claims that in light of the "green lights" he received from Treadway, he had no reason to know that the Canary arrangement might be problematic. As Corba characterizes the Canary arrangement, it was a "global relationship" involving some active trading along with longer term investments, rather than a "quid pro quo" whereby Canary Capital Partners LLC received market timing privileges in exchange for the long-term investment of significant sums. Corba also requests summary judgment on the Investment Company Act claims on the ground that he is not an "investment adviser" as defined under that statute.

To support their respective positions, each party has presented a voluminous record of evidence, including documents, deposition transcripts, and interrogatories. As explained below, the Court finds that the evidence presented demonstrates that disputed issues of material fact exist on every claim, precluding summary judgment for any party.

---

3. The prospectuses at issue are the PIMCO Funds Prospectus dated November 1, 2001 (the "November 2001 Prospectus"), attached as Exhibit 126 to the Declaration of Stephen W. Howell, dated October 2005 ("Howell Decl."), and the PIMCO Funds Prospectus dated February 5, 2002 (the "February 2002 Prospectus") at 96, attached as Exhibit 127 to Howell Decl. Because the particular disclosures at issue are the same in both prospectuses, the Court refers to these collectively as the "Prospectus." (The Court further notes that the Howell Declaration indicates only that it was executed in October 2005 but does not specify a date; however, the proof of service attached to it indicates that it was served on October 6, 2005.)

## II. FACTS [4]

### A. *THE PARTIES*

PIMCO Funds: Multi–Manager Series (the "PIMCO Funds") was a registered investment company comprised of 45 separate investment series or mutual funds. The PIMCO Funds was governed by a Board of Trustees. The PIMCO Funds offered up to six classes of shares of each of its funds.

The PIMCO Funds contracted with various providers for services necessary to operate the investment series or mutual funds. PA Fund Management LLC ("PAFM"), formerly known as PIMCO Advisors Fund Management LLC, is an investment adviser registered with the SEC with which the PIMCO Funds contracted to provide investment advisory and supervisory services, as well as administrative services, to the PIMCO Funds. The parties dispute to various degrees the level of responsibility PAFM retained vis-a-vis the PIMCO Funds and its Board of Trustees, and vis-a-vis certain sub-advisers to which PAFM sub-contracted certain services.

Two agreements governed the relationship between the PIMCO Funds and PAFM: the Administration Agreement and the Investment Advisory Agreement. The Administration Agreement provided that "[s]ubject to the general supervision of the Board of Trustees," PAFM was to "provide or cause to be furnished all organizational, administrative and other services reasonably necessary for the operation of the [PIMCO] Funds." (Amended and Restated Administration Agreement ("Administration Agreement") at 2, attached as Exhibit F to Declaration of Newton B. Schott, Jr., dated Sept. 30, 2005 ("Schott Decl.").) [5] This agreement fur-

---

**4.** The following recitation of facts is derived from the parties' various submissions in accordance with Local Rule 56.1, specifically: Statement of Undisputed Material Facts in Support of Plaintiff's Motion for the Entry of Summary Judgment Against Defendants Treadway and Corba ("SEC R. 56.1 Statement"); Response of Defendant Stephen J. Treadway to Plaintiff's Statement of Undisputed Material Facts and Counterstatement of Undisputed Material Facts ("Treadway R. 56.1 Response" or "Treadway R. 56.1 Counterstatement"); Defendant Kenneth W. Corba's Response to the SEC's Local Rule 56.1 Statement of Material Facts ("Corba R. 56.1 Response"); Defendant Kenneth W. Corba's Local Rule 56.1 Statement in Support of Motion for Summary Judgment ("Corba R. 56.1 Statement"); and Plaintiff Securities and Exchange Commission's Statement of Genuine Issues in Opposition to Defendant Kenneth W. Corba's Motion for Summary Judgment ("SEC R. 56.1 Response"). Facts are undisputed unless otherwise noted. Treadway's and Corba's voluminous responses frequently do not dispute a statement of fact but instead declare it to be incomplete and misleading. Unless specifically disputed, each fact is deemed admitted, in accordance with Local Rule 56.1(c). No further specific reference to these documents will be made, except as quoted or otherwise indicated in the text below. The Court occasionally refers directly to the supporting affidavits and exhibits; in these instances the Court so indicates in the text. The Court also notes that the record before it includes certain SEC responses to Corba's requests for admissions that were added to the record after the summary judgment briefing schedule had concluded; these responses became part of the record on February 1, 2006, when the Court granted Corba's unopposed motion to supplement the summary judgment record with these responses.

**5.** This Administration Agreement between the PIMCO Funds and PAFM was in effect between March 7, 2003 and December 31, 2003. (Schott Decl. ¶ 10.) Prior to that agreement taking effect, the PIMCO Funds had an administration agreement with PIMCO Advisors L.P. ("PALP"). (*See* Schott Decl. ¶¶ 6, 9; Amended and Restated Administration Agreement, attached as Exhibit E to Schott Decl.) Effective September 30, 2002, PALP assigned its position as investment adviser and administrator to its affiliate, PAFM. The extent of any distinction between PAFM and PALP is unclear. The SEC states that any distinction

ther provided that as part of the administrative services provided by PAFM to the PIMCO Funds, PAFM would "prepar[e], fil[e], and arrang[e] for the distribution of proxy materials and periodic reports to shareholders of the Funds as required by applicable law" and "prepar[e] and arrang[e] for the filing of such registration statements and other documents with the SEC and other federal and state regulatory authorities as may be required to register the shares of the Funds and qualify the Trust to do business or as otherwise required by applicable law." (*Id.*) Corba states that PAFM, as administrator, was specifically responsible for drafting, preparing, and disseminating all prospectuses and other disclosure documents for funds within the PIMCO Funds. Corba also states that PAFM never delegated to PEA or any other sub-adviser [6] the responsibility for drafting, preparing, or disseminating the Prospectus. The SEC disputes this characterization of PAFM and its sub-advisers' respective responsibilities, pointing out that Corba testified that he occasionally was asked questions on information to be included in the Prospectus and that PAFM occasionally had sub-advisers, including PEA, review and comment upon certain portions of the Prospectus—specifically, fund investment policies and restrictions, investment strategies employed by sub-advisers, and information about the sub-advisers.

The Investment Advisory Agreement provided that, "[s]ubject to the general supervision of the Board of Trustees, [PAFM was to] provide general, overall advice and guidance with respect to the Funds and provide advice and guidance to the [PIMCO Funds'] Trustees. In discharging these duties [PAFM was to], either directly or indirectly through others ("Portfolio Managers") engaged by it pursuant to Section 3 of this Agreement, provide a continuous investment program for each Fund and determine the assets of each Fund." (Amended and Restated Investment Advisory Agreement ("Investment Advisory Agreement") at 2, attached as Exhibit C to Schott Decl.) [7] The Investment Advisory Agreement also provided that PAFM could, "subject to its supervision," hire others, including but not limited to its own subsidiaries and affiliated persons, "to render any or all of the investment advisory services that [PAFM was] obligated to render under this Agreement." (*Id.* at 4–5.) In addition, the Prospectus noted that the shareholders of the funds managed by Corba had approved a proposal allowing PAFM to enter into new or amended agreements with sub-advisers without seeking approval of the shareholders. This proposal was subject to the conditions of an SEC order exempting the PIMCO Funds and PAFM from seeking shareholder approval of these contracts, which is otherwise required under the Investment Company Act. The order required the Board of Trustees to approve any such agreement, as is required by Section 15(a) of the Investment Company

---

between PAFM and PALP is not relevant since they were affiliated entities within the same organization. The Court notes that the terms of the two administration agreements are essentially the same and that both contain the language quoted above regarding administrative duties to be provided pursuant to the agreement. For ease of reference, PAFM shall be referred to as the PIMCO Funds' investment adviser and administrator.

6. PEA was an entity that acted as a sub-adviser to PAFM; the details of this arrangement are explained in greater detail below.

7. PALP served as the investment adviser pursuant to an essentially identical agreement from January 1, 2001 until September 30, 2002, at which time, pursuant to a novation agreement, PAFM assumed those responsibilities. (*See* Schott Decl. ¶¶ 6–8.)

Act, and prohibited PAFM from entering into sub-advisory agreements with its affiliates unless those affiliates were substantially wholly owned by PAFM. (*See* November 2001 Prospectus at 50.) PEA was an affiliate of PAFM. As of January 1, 2002, PEA was wholly owned by PAFM. (*See* November 2001 Prospectus at 48.)

PAFM did in fact employ a number of sub-advisers pursuant to the Investment Advisory Agreement. One of these was PEA Capital LLC ("PEA"), formerly known as PIMCO Equity Advisors LLC. PEA was an investment adviser registered with the SEC that served as an investment sub-adviser for ten mutual funds that were part of the PIMCO Funds, including the Growth Fund, Select Growth Fund, Opportunity Fund, Target Fund, and Innovation Fund. As an investment sub-adviser, PEA provided portfolio management services regarding these funds.

The parties disagree over the level of independence and discretion enjoyed by sub-advisers in making investment decisions. The SEC states that PEA "ha[d] full investment discretion and ma[d]e[ ] all determinations with respect to the investment of a fund's assets subject to the general supervision of PAFM and the Board of Trustees of the PIMCO Funds." (SEC R. 56.1 Statement ¶ 4.) While Treadway does not dispute this, he declares it misleading, both because portfolio management was outsourced and because he states that his roles did not entail supervision of PEA's investment determinations or day-to-day management. According to Treadway, because portfolio management was outsourced, PAFM did not have any responsibility for portfolio management. According to Corba, under the Investment Advisory Agreement, PAFM "took respon-

sibility" for investment advice and guidance and "had ultimate responsibility to oversee any sub-advisers." (Corba R. 56.1 Statement ¶¶ 6–7.) Per the November 2001 Prospectus, "[e]ach sub-advisor has full investment discretion and makes all determinations with respect to the investment of a Fund's assets, subject to the general supervision of [PAFM] and the Board of Trustees." (November 2001 Prospectus at 47.) The SEC also points out that PEA was an affiliate of PAFM and was located at the same address as PAFM for at least part of the relevant period.

PA Distributors LLC, formerly known as PIMCO Advisors Distributors LLC ("PAD"), is a broker-dealer registered with the SEC. PAD employed individuals responsible for monitoring trading activity to prevent or limit market timing in investments in the PIMCO Funds.[8] PAD's responsibilities were set forth in a Distribution Agreement between itself and the PIMCO Funds.

Treadway served as PAFM's Chief Executive Officer ("CEO") and a Managing Director, PAD's CEO and a Managing Director, and the Chair of the Board of Trustees for the PIMCO Funds. Corba served as PEA's CEO, Chief Investment Officer ("CIO"), and a Managing Director. Corba also served as the portfolio manager for the PEA Growth and Select Growth Funds.

Canary Capital Partners LLC was a domestic hedge fund; Canary Capital Partners Ltd. was an offshore hedge fund. Both were managed by an investment adviser, Canary Investment Management LLC, whose principal was Edward J.

---

8. Treadway does not dispute that PAD employed individuals responsible for monitoring trading activity, but disputes that such indi-

viduals were called "timing monitors," as the SEC labels them. (*See* Treadway R. 56.1 Response ¶ 5.)

Stern ("Stern"). The Court refers to the Canary entities collectively as "Canary."[9]

## B. *THE ARRANGEMENT*

According to the SEC, in October 2001, PEA was approached by two representatives, Ryan Goldberg ("Goldberg") and Michael Grady ("Grady"), of the broker-dealer Brean Murray & Co. ("Brean Murray") about the possibility of their client, Canary, entering into a market timing arrangement with the PIMCO Funds. These representatives then met with Corba and John Cashwell ("Cashwell"), PEA's former Senior Vice President of Institutional Marketing, in or around early November 2001, and proposed a relationship whereby (1) Canary would have approximately $100 million in trading capacity in some PIMCO Funds investment products at a rate of at least four round trips per month; (2) Canary's investment would be no more than three percent of each fund in which it was invested; and (3) in exchange for this market timing capacity, Canary would provide a long-term investment of 25 percent of the value of trading capacity into another of the PIMCO Funds' investment products.

Subsequently, according to the SEC, Corba met with PEA's managing directors and Cashwell regarding the proposed arrangement and informed them that PEA was entering into a market timing relationship. The terms permitted Canary to have $100 million of trading capacity in the Growth, Target, and Innovation Funds, with up to four round trips per month in each fund and the amount of money invested by Canary in each fund not to exceed three percent of each fund's assets. In

addition, in exchange for this timing capacity, Canary would make a $25 million long-term investment into the Select Growth Fund, which represented 25 percent of the overall trading capacity. According to the SEC, Corba determined that the $25 million long-term investment be made into the Select Growth Fund, which was a fund that he managed and which would double the size of the fund.

Treadway does not dispute these facts, except for the use of the phrase "market timing arrangement," but he characterizes them as misleading in that he had no knowledge of them. To the SEC's recitation Treadway adds that the Brean Murray representatives sent Corba a letter dated November 2, 2001 setting forth what they believed to be the terms of the arrangement, and that Corba denies receiving the letter. The letter stated:

> We are proposing a relationship where our clients, Canary Capital and Trout Trading Management Co., has approval from you to trade on a short term basis in three PIMCO funds, PIMCO Target fund, PIMCO Innovation fund, and the PIMCO Growth fund. Our Proposal is capacity for up to three percent of the aforementioned funds, for trading on a short-term basis. Short term trading can be defined as trading four to five round trips per calendar month. Additionally Canary and Trout will make a commitment of long-term assets to either a bond fund, a money market fund or the portfolios that they are doing short term trading in. These clients are generally comfortable with depositing 25% of total assets into the long-term commitments.

9. The parties occasionally refer to the Canary relationship as the "Stern relationship." In some instances, the difference in terminology is relevant, such as for Treadway's contention that Corba informed him only that Stern was interested in investing but did not mention Canary. In other instances, the difference in terminology is not relevant. The Court will refer to the entities as "Canary" unless specifically referring to Stern as an individual.

(*See* Letter from Ryan D. Goldberg to Kenneth W. Corba, dated Nov. 2, 2001, attached as Exhibit 27 to Declaration of Samuel Bonderoff, dated Nov. 10, 2005 ("Bonderoff Decl.")) [10]

Corba strongly disputes these facts. Although he does not disagree that these meetings occurred, he contests the substance of the conversations and all details of the proposed relationship. Most fundamentally, Corba disputes that any market timing arrangement existed with any specified terms. Corba characterizes the relationship between the PIMCO Funds and Canary instead as a " 'global relationship' that would include active trading and longer term investments totaling somewhere between $50 million and $100 million" (Corba R. 56.1 Response ¶ 12.), with the longer and shorter term investments not tied to each other in any sort of quid pro quo. According to Corba, he was told that Canary would not trade more than three percent in any one fund and that the frequency of the trades would not exceed four round trips per month, and Treadway and Corba allowed the relationship to proceed on a "controlled and observable 'trial basis' that would permit termination at any time." (*Id.*) Finally, Corba states that Cashwell, rather than Corba, acted as the chief facilitator of the Canary arrangement, and that Stern made the ultimate decision to invest in Select Growth.

In or about January 2002, Corba met with Treadway to discuss the proposed relationship with Canary. What transpired at this meeting is disputed. According to the SEC, Corba told Treadway that a member of a wealthy and reputable family, Edward Stern, was interested in the PIMCO Funds and in establishing a long-term relationship with PEA; that Corba wanted to get Stern to invest in his Select Growth Fund; that Stern "was interested in 'active trading' that 'could potentially run afoul' of the PIMCO Entities' market timing policies" (SEC R. 56.1 Statement ¶ 14); that the PIMCO Funds would be informed about Stern's trades; and that Stern would not invest more than three percent into any one of the PEA-managed funds at any one time. According to the SEC, Corba needed Treadway's approval to proceed because it involved a significant amount of money and the accommodation of market timing; furthermore, Treadway approved the relationship.

Treadway disputes that he and Corba ever discussed a proposed market timing arrangement. According to Treadway, Corba did not describe the arrangement as market timing; instead, based on the information conveyed to him by Corba, Treadway believed that Stern wanted "a long-term relationship" but that "it was possible" that he might engage in "occasional 'active trading' under certain market conditions." (Treadway R. 56.1 Response ¶ 13.) Treadway states that Corba did not tell him that Stern was intending to invest through a hedge fund such as Canary, which would have been a red flag to Treadway that Stern was a market-timer, nor did Corba tell Treadway that he was giving Stern permission to make four round trips per month. Instead, Treadway asserts that Corba told him there would be certain periods when the market was choppy when the trading would be "pretty active" but that otherwise Stern's investments would have "more long-term investment characteristics". (*Id.* ¶ 14.)

**10.** The identical letter, absent an exhibit identification sticker and certain fax transmission information, and marked with additional Bates numbers and different fax transmission information, is attached as Exhibit 5 to the Declaration of Adam D. Schneir, dated October 6, 2005 ("Schneir Decl."); the SEC cites to this letter in Paragraph 9 of its Rule 56.1 Statement.

Treadway claims that he "reminded Corba of their fiduciary duty to protect their shareholders from harm." (*Id.*) According to Treadway, Corba promised to closely monitor the trading to ensure that it did not harm shareholders, and to keep Stern's investment in cash if necessary so that if trading appeared to be active it could be liquidated quickly, minimizing transaction costs; and Treadway and Corba agreed that the trading would proceed only on a "trial basis" and would stop if it ever threatened harm to the shareholders. (*Id.*) Treadway also states that Corba did not need his approval and that he permitted the trading only because of Corba's misrepresentations and omissions.[11]

Corba also disputes what transpired at the meeting. According to Corba, he did not tell Treadway that he wanted to get Stern to invest in his Select Growth Fund, but rather that Stern was interested in investing in the Select Growth Fund and the Horizon Hedge Fund. Corba disputes that he told Treadway that Stern was interested in "active trading" that "could potentially run afoul" of PIMCO's market

11. Because what transpired at the January 2002 meeting between Treadway and Corba is sharply disputed, and is highly relevant to issues of scienter, the Court herewith sets forth Treadway's testimony as to this meeting. According to Treadway, the following took place during the meeting:

> [Corba] reported that—that Ed Stern was a member of a very reputable New York family. They had their name on the NYU Business School. They were philanthropists, Rockefeller-like. They liked his funds, were following his funds and they wanted to invest in his funds and that they wanted to establish a long-term relationship with our firm. They said to him, "But we must tell you that we are active traders. Call us momentum traders," is how Ken characterized them, "and we will, from time to time, depending on markets, do some active trading. This could potentially run afoul of your market-timing policies and wind up in your freezing our accounts or whatever." Ken said that ... their requests were for investments in his domestic equity funds. He didn't have any international. As you know, domestic equity funds don't provide a whole lot of opportunity for stale pricing or market timing. He said that he would be—that is, Ken Corba, the CEO and CIO of that organization—that he would monitor and assure us that there would be no harm to these funds or shareholders and that, if their momentum trading was active, he would be all over it. I warned him at the time—I said, "We both have a fiduciary responsibility to these funds and to our shareholders." While I would admit that these people, at that point in time, had really outstanding credentials and reputa-

> tion, the duty of our shareholders came first, and it wasn't—looking at an overall relationship, it was each fund, fund by fund. That is where it starts and that's where it ends.
>
> Ken ... said he'd worked out safeguards with them ... we didn't go into great detail, but the amounts, the percentage of the investments, that they would be informed when the trades were going to come and, if there was going to be active trading, they would know when they're coming and when they're going so that Ken would have the option—it was appropriate to put it in cash. He was quite confident that there would be no harm to any of these funds. Since we had basically—in retrospect, I should say, we had never dealt with this kind of an approach, someone who came in the front door—we're used to dealing with people in the market-timing category who are completely deceitful, as I described before, an endless cat-and-mouse game. By coming in the front door, by describing their desire for a long-term relationship, by being interested only in domestic funds where there really aren't any legitimate ways of, in my experience, market timing and making money, and with Ken Corba's assurances, it seemed appropriate to say, "We will do this on a trial basis, but we reserve the right to end this if we deem that there's harm to the shareholders at any time." So that, in summary, was the sum and substance of our meeting.

(Investigative Testimony of Stephen J. Treadway, dated Feb. 26, 2004 ("Treadway Investigative Test."), at 73:18–75:20, attached as Exhibit 91 to Schneir Decl.)

timing policies. (Corba R. 56.1 Response ¶¶ 13–14.) Finally, Corba states that the characterization is misleading in that Treadway's approval was needed because he was the Chair of the PIMCO Board of Trustees, because those who monitored trading reported to him, because it involved a significant amount of money, because Corba did not know if Brean Murray already had a relationship with PIMCO, and because he did not know if the proposed trading was permissible.[12]

In February 2002, Canary executed its first transactions in the Innovation Fund. However, according to the SEC, Canary was forced to stop trading in that fund because its portfolio manager, Dennis McKechnie ("McKechnie"), decided that the timing activity was too disruptive. The factual issues related to why McKechnie wanted to terminate Canary's trading in the Innovation Fund are disputed and discussed in further detail below. Nonetheless, according to the SEC, this termi-

nation precipitated additional meetings to discuss obtaining capacity in other PIMCO funds. Thus, in March 2002, Corba and Cashwell met with Stern and the broker representatives to discuss Stern's interest in obtaining additional capacity in other PIMCO Funds, as well as investing in a PIMCO hedge fund; Corba suggested the PIMCO Equity Advisors Horizon Fund LP (the "Horizon Fund"). The SEC alleges that Corba knew that Stern was disappointed about losing capacity in the Innovation Fund and suggested the Opportunity Fund instead. Accordingly, Stern met with Michael Gaffney ("Gaffney"), the portfolio manager for the Horizon and Opportunity Funds, along with Cashwell, and on March 25, 2002, Cashwell sent Corba an email stating that Canary "still wants in on Innovation and would like to invest a bit in Opportunity as part of the deal." (SEC Rule 56.1 Statement ¶ 19.) Soon after, Canary invested $2 million in the Horizon Fund on

---

12. Corba has testified that his meeting with Treadway occurred a day or two after he met with Stern. (*See* Investigative Testimony of Kenneth W. Corba, dated February 23, 2004 ("Corba Investigative Test."), at 92:17–20, attached as Exhibit 93 to Schneir Decl.) Among the details provided in Corba's testimony regarding his conversation with Treadway are the following: Corba told Treadway that Stern "has some timing model that he wants to execute;" that Corba

wasn't clear what [the timing model] was. I just assumed it was a standard timing model and ... we both came to the conclusion that it was ... potentially legitimate business.... I said, "I know you discourage market timing," and he was somewhat cynical about it, just as, you know, we did— he made it clear that we discourage market timing, but I said, "This is a discrete amount of money that we can track and follow and monitor," and I said, "Why don't we try it on a trial basis and, if there's no down side to us, if we ever feel at any point in time that there's—that there's anything that would be a detriment to the shareholders, we can stop it immediately."

I said, "I—I think with that finite amount of money, particularly if we can track it and we know where it's going, let's give it a try on a trial basis."

(*Id.* at 92:21–94:6.) According to Corba, Treadway then

said, "Well, okay." He said, "As long as long as you're—as long"—he kind of put the responsibility at the portfolio manager level to make sure that there wasn't any potential harm to the shareholders.

(*Id.* at 94:7–11.) Corba also stated that he

just knew that, as a general policy, [Treadway] was cynical and—about market timing and, as a general policy, discouraged market timing. I was sort of appealing to him to the sense that, you know, this—this was certainly manageable and we could just do it on a trial basis. If it didn't work, it didn't work.

(*Id.* at 95:25–96:5.)

Corba also stated that he "was aware from a general discussion two or three months before ... I was aware that, as a firm, we discouraged market timing or we terminated some market timers, but I also knew that we had discretion." (*Id.* at 96:24–97:4.)

a long-term basis and received $5 million in trading capacity in the Opportunity Fund. In addition, Canary obtained a waiver of the lock-up period for investments into the Horizon Fund in the event the market timing arrangement ended; this waiver was detailed in an April 4, 2002 letter from PEA to Stern that stated, "In the event the market timing relationship between Canary[ ] and PIMCO Funds ceases, PIMCO Equity Partners will waive the 12–month lock-up period, without penalty, for investments ... in the PIMCO EQUITY ADVISORS HORIZON FUND, L.P." (SEC Rule 56.1 Statement ¶ 21 (quoting Letter from Taegan Goddard, Managing Director, Chief Operating Officer, PIMCO Equity Advisers, to Edward Stern, dated April 4, 2002, attached as Exhibit 22 to Schneir Decl.).)

Treadway does not dispute these facts but states that he did not have any responsibility for monitoring or distributing PEA hedge funds; that Corba did not tell him about Stern's investment in the Horizon Fund; that he was not aware of Stern's investment in the Horizon Fund until September 2003; and that he never had any knowledge of the waiver of the lock-up period.

Corba disputes the timing as well as the content of the meeting between himself, Cashwell, Stern, and the broker representatives; he further disputes the SEC's facts by specifically countering that Stern was not allowed to trade in Innovation again, that the investments in the Opportunity and Horizon Funds were handled directly by Cashwell and Gaffney; that the arrangement to invest in the Horizon Fund was worked out between Stern, Cashwell, and Gaffney and did not involve Corba; and that there was no quid pro quo regarding the Horizon and Opportunity Funds. Corba also states that the investments were "always presented as being part of a 'broad' or 'global' relationship" (Corba R. 56.1 Response ¶ 20) and that he was not involved in granting the waiver and did not learn of it until well after it had been granted.

PEA received one percent of the total assets under management and a performance fee consisting of 20 percent of the net profits generated by the fund in annual fees from the Horizon Fund; PAFM received an advisory fee of 0.65 percent of net assets under management for the Opportunity Fund and paid a portion of these fees to PEA.

## C. CANARY'S TRADING ACTIVITY

### 1. Initial Investments in Select Growth and Other Funds

From February 1, 2002 to February 8, 2002, Canary invested $25 million in long-term assets into the Select Growth Fund, almost doubling the size of the fund. Treadway does not dispute this fact but claims it is misleading in that he did not learn about the investment until much later. Corba does not dispute that $25 million was invested, but disputes its characterization as "sticky assets" and disputes that it was an "agreed upon" amount, even though the SEC points to a February 6, 2002 email sent to Corba by one of the Brean Murray brokers letting Corba know that "we still have $10 million to buy to reach our *agreed upon* number of $25 million." (Email from Ryan Goldberg, dated Feb. 6, 2002, attached as Exhibit 16 to Schneir Decl. (emphasis added); SEC R. 56.1 Statement ¶ 23; Corba R. 56.1 Response ¶ 23.)

From February 4 to February 8, 2002, Canary also placed approximately $60 million into fixed-income and money market funds for timing purposes.

2. *Trading Activity in Target, Growth and Innovation Funds; Investment in Select Growth Fund*

On or around February 8, 2002 Canary began timing activities in the Target and Innovation Funds. On February 12, 2002, Corba, Treadway, and others received an email notification from Steve Howell, one of the PAD employees who monitored timing activity regarding these initial transactions.

From approximately February 8, 2002 through April 3, 2002, Canary traded extensively into and out of the Target Fund from other funds, including several fixed-income funds that were not parties to the Canary arrangement and which requested in March that the trading activity cease. Treadway does not dispute these events (other than objecting to the SEC's use of the phrase "special Canary arrangement") but denies knowledge of them. Corba disputes these issues in part, stating that there was no "special Canary arrangement" but rather an "overall relationship that consisted of some controlled and monitored active trading by Canary in certain mutual funds as well as some long term investments in other funds," and that he did not participate in any discussions relating to the fixed income funds. (Corba R. 56.1 Response ¶ 25.)

From February 8, 2002 to February 21, 2002, Canary also traded in the Innovation Fund, but was forced to stop at the request McKechnie, the fund's portfolio manager. According to the SEC, the Innovation Fund's investment strategy was negatively affected by the extreme inflow and outflow of cash, causing McKechnie to conclude that Canary's trading activity was disruptive to the fund. While Treadway does not dispute these facts (although denying any knowledge of them), Corba heavily disputes them. According to Corba, the Innovation Fund was not negatively affected by these trades and the trading was not disruptive. Rather, according to Corba, McKechnie requested that the trading cease because he "feared the potential trading might interfere with his unique, meticulous strategy for short-term cash management." (Corba R. 56.1 Response ¶¶ 16, 26.)

The SEC contends that because Canary was forced to stop trading in the Innovation Fund, its total timing capacity in the PIMCO Funds investments was reduced from the originally promised $100 million to approximately $60 million; as a result, on April 12, 2002, Canary lowered its long-term investment in the Select Growth Fund from $25 million to $20 million to reflect its lost trading capacity in the Innovation Fund. Corba contests the existence of any agreed-upon timing capacity, any link between the reduction in the Select Growth Fund investment and ability to trade in the Innovation Fund, and any quid pro quo between Canary's longer and shorter term investments.

When and what Treadway knew about the Select Growth Fund investment is in dispute. According to the SEC, Treadway learned from Corba in April or May 2002 that Canary had made a long-term investment into the Select Growth Fund. According to Treadway, he did not know for certain of this investment until at least Summer 2002, and he did not know that the Select Growth fund investment was different in nature from Canary's other investments and that it would be exchanged for timing capacity in other PIMCO funds.

From April until November 2002, Canary timed the Growth and Target Funds and throughout this period, the broker representatives emailed Corba and others trade notifications for the purchases and redemptions involved in this activity. Treadway does not dispute these facts but

denies knowledge of them. Corba does not dispute the purchases and redemptions, but disputes that these were "round trip exchanges" as defined in the Prospectus. Corba also does not dispute the email notifications, but states that these emails allowed PEA and PAD to monitor the trading to ensure that it did not cause any harm.

### 3. *Investments in Horizon Fund and Opportunity Fund*

Canary also invested $2 million into the Horizon Fund on or around April 1, 2002. The SEC describes this investment as "sticky assets," given in exchange for the ability to market time the Opportunity Fund. On April 11, 2002, Canary placed $ 5 million in the Opportunity Fund, and timed that fund until April 3, 2003. Corba does not dispute that a $2 million investment was made in the Horizon Fund but disputes that this investment was linked to investments in the Opportunity Fund. Corba also states that Canary's investments in the Opportunity and Horizon Funds were facilitated by Cashwell and Gaffney, not Corba.

### 4. *Total Number of Round Trips in the Opportunity, Growth, and Target Funds*

According to the SEC, Canary conducted a total of 110 round trips; 100 of these took place from February to November 2002, and an additional 10 took place from December 2002 to April 2003. Specifically, Canary conducted the following round trip activity: (1) from February 2002 through November 2002, 40 round trips in the Target Fund, with an overall dollar volume of over $2.3 billion; (2) from April 2002 through November 2002, 28 round trips in the Growth Fund, with an overall dollar volume of nearly $1.8 billion; (3) from April 2002 through November 2002, 32

round trips in the Opportunity Fund with an overall dollar volume of approximately $300 million; and (4) from December 2002 through April 2003, 10 round trips in the Opportunity Fund, with an overall dollar volume of over $70 million.

Treadway does not dispute these facts, although he denies knowledge of them. He also avers that the dollar figures are misleading because they include both purchases and sales, which according to Treadway is not an accepted or meaningful measure of trade volumes.

Corba strongly disputes these facts. According to Corba, Canary moved money (1) into and out of the Target Fund 37 times, rather than 40 times; (2) into and out of the Growth Fund 25 times, rather than 28 times; and (3) into and out of the Opportunity Fund 30, not 32, times between April 2002 and November 2002, and 7, not 10, additional times between December 2002 and April 2003. According to Corba, only 7 of these trades—in the Target Fund—were "round trip exchanges" as defined by the Prospectus; the rest were purchases and redemptions, not exchanges.

Corba also states that the overall dollar volume of trades is meaningless "because Stern never allocated more than $35 million to its trading" in either the Target or Growth Funds and not more than $5.2 million to the trading in the Opportunity Fund. (Corba R. 56.1 Response ¶¶ 29–30.) In addition, Corba states that the impact of this trading was "negligible" and that it did not cause the share turnover of the funds to exceed industry norms. (*Id.*)

Finally, Corba states that the SEC failed to disclose that Corba's name was removed from email trade notifications after November 2002 regarding the Opportunity Fund, and points to evidence that he says demonstrates that he knew nothing of

the continued trading in the Opportunity Fund after November 2002.

### 5. *Fees and Bonuses*

According to the SEC, the PIMCO Entities received $224,451 in advisory fees as a result of Canary's trading and investment activity in the Innovation, Target, Growth, Opportunity, Select Growth and Horizon Funds. Treadway disputes the SEC's treatment of "the different PIMCO Entities as a unit," noting that he states in his deposition that he assumed advisory fees were generated, but that he did not know the amounts involved. (Treadway R. 56.1 Response ¶ 31.) Corba similarly disputes these facts on the ground that the $224,451 in advisory fees were paid to PAFM, not PAD or PEA. However, the evidence to which Corba cites, page 83 of the February 2002 Prospectus, indicates that while advisory fees were paid by the funds to "PIMCO Advisors," *i.e.*, PAFM, in cases where PAFM retained a sub-adviser, PAFM paid a portion of the fees it received to the sub-adviser. Moreover, neither Treadway nor Corba disputes the SEC's earlier statement that PAFM received an advisory fee of 0.65 percent of net assets under management for the Opportunity Fund and paid a portion of these fees to PEA. Thus, while the distribution of the entire amount may be in dispute, it is clear that PAFM received advisory fees and that at least some portion of these advisory fees were distributed to PEA.

According to the SEC, an incentive fee of $35,039 was also received as a result of Canary's investment in the Horizon Fund.[13] Treadway points out that the SEC does not state the recipient of the fee. Although Corba states that he strongly disputes the factual issues contained in the Paragraph 31 of the SEC's Rule 56.1 Statement, which includes facts about the incentive fees, the only issues he specifically elaborates upon are those, addressed above, concerning the $224,451 in advisory fees; he does not point to any evidence concerning the incentive fees or explain why he might be disputing that incentive fees were received; accordingly, because the incentive fees are not specifically controverted, this fact is deemed admitted by Corba.

In 2002 Treadway received, among other compensation, an $8 million bonus related to the PIMCO Funds purchases and sales that year. Although a portion of this bonus was attributable to Canary's purchases and sales, Treadway asserts he did not know what portion of his bonus was so attributable. Treadway adds that the Canary trading accounted for only about three percent of his bonus, and that Canary originally traded via exchanges, which did not count as sales for purposes of his bonus calculation. Corba does not dispute the bonus, except to state that the SEC has no evidence that anyone received any compensation directly from Canary or that Canary's investments were treated any differently from those made by other investors.

### D. *THE PIMCO FUNDS' DISCLOSURES*

#### 1. *The Prospectus and Other Disclosure Documents*

While the text of the disclosures at issue is not disputed, the meaning of those disclosures is sharply disputed. The Prospectus contained the following language:

---

**13.** The SEC presumably means that part of the PIMCO Entities received these incentive fees; however, the SEC does not specify who or what entity received these fees. The evidence to which the SEC cites in support of this proposition also does not specify who or what entity received the incentive fees.

The Trust reserves the right to refuse exchange purchases, if, in the judgment of PIMCO Advisors, the purchase would adversely affect a Fund and its shareholders. In particular, a pattern of exchanges characteristic of "market-timing" strategies may be deemed by PIMCO Advisors to be detrimental to the Trust or a particular Fund. Currently, the Trust limits the number of "round trip" exchanges an investor may make. An investor makes a "round trip" exchange when the investor purchases shares of a particular fund, subsequently exchanges those shares for shares of a different PIMCO Fund and then exchanges back into the originally purchased Fund. The Trust has the right to refuse any exchange for any investor who completes (by making the exchange back into the shares of the originally purchased Fund) more than six round trip exchanges in any twelve-month period. Although the Trust has no current intention of terminating or modifying the exchange privilege other than as set forth in the preceding sentence, it reserves the right to do so at any time. Except as otherwise permitted by the Securities and Exchange Commission, the Trust will give you 60 days' advance notice if it exercises its right to terminate or materially modify the exchange privilege with respect to Class A, B and C shares.

(November 2001 Prospectus at 59; February 2002 Prospectus at 96.) The PIMCO Funds' "Statements of Additional Information" and "Shareholder Guides" contained similar statements. From November 2001 to September 2003, there were only minor changes to this language not relevant here. Treadway signed the PIMCO Funds' registration statements, which included these disclosures, that were filed with the SEC.

Apart from the existence of these words in the Prospectus and similar documents, the parties agree on nothing with respect to the disclosures. According to the SEC, the Prospectus or other disclosure documents filed with the SEC set forth a clear anti-market timing policy limiting the number of round trips that investors could make. Thus, these documents were misleading for not disclosing the market timing arrangement with Canary or that selected shareholders could make long-term investments in some PIMCO investment vehicles in order to obtain the right to market time PIMCO mutual funds. In particular, the Prospectus did not disclose that the Select Growth Fund received a $25 million investment from Canary in exchange for timing privileges.

Treadway disputes that the Prospectus categorically limited the number of round trip exchanges available to investors. He further disputes that these disclosures related only to market timing, stating instead that this language gave PAFM and PAD the discretion to determine whether any trading activity, including market timing or activity that might exceed six round trips in a 12–month period, should not be permitted because it was detrimental to shareholders. According to Treadway, the Prospectus's reference to six round trips was merely to provide guidance regarding the underlying policy to investors, including putting them on notice that their accounts could be frozen, and to give PAD personnel a simple standard to use in their enforcement of the policy, but it was not itself the underlying policy. However, this six-round trip standard did not overrule the overall policy, which was dependent upon a determination of harm. Treadway does not dispute that Canary was not mentioned in the disclosure documents, but disputes the implication that Canary's trading or the Canary arrangement should have been disclosed, stating instead that it was not required to be disclosed because

the treatment of the Canary arrangement was consistent with the PIMCO Funds' policy with respect to market timing. According to Treadway, the Prospectus required the PIMCO Funds to make a "judgment" whether frequent trading would "adversely affect" a fund and its shareholders. (Treadway R. 56.1 Response ¶ 33.) According to Treadway, since the overall policy was dependent upon a determination of harm, and PEA was monitoring Canary's trading to prevent harm and the monitoring was successful, the policy was properly enforced as to Canary.

Corba similarly does not dispute that the Prospectus contained the language excerpted above, and that other disclosure documents contained similar language, but disputes the meaning and implication of this. Corba points out that the above excerpt was surrounded by other language that describes the exchange policy in further detail,[14] and states that this language must be read in full and in context with the rest of the 128–page Prospectus, particularly the adjacent sections of the Prospectus that related to pur-chases and redemptions as opposed to exchanges. Corba disputes that he had knowledge of the language of the exchange policy and states that the SEC has no evidence that he knew whether the Canary relationship was disclosed in the Prospectus. He further disputes these facts by pointing to his testimony that he was not involved in any discussions regarding disclosure of the Canary arrangement either in the Prospectus or to the members of the Board of Trustees, other than Treadway. Thus, Corba disputes that he knew that the PIMCO Funds discouraged market timing and that the Canary arrangement was an exception, or that he was aware of any conflict between the language of the exchange policy and Canary's trading. He further states that he received approval to move forward with the Canary relationship from Treadway, who did head the companies responsible for drafting the Prospectus and implementing the exchange policy, and based on his discussions with Treadway, Corba had no reason to believe the Canary relationship was in any way incompatible with the Prospectus.

14. In particular, the paragraph preceding the above excerpt stated the following:

Except as provided below and/or in the applicable funds' or series' prospectus(es), you may exchange your Class A, class B or Class C shares of any Fund for the same Class of shares of any other Fund or of another series of the Trust or PIMCO Funds: Pacific Investment Management Series. Shares are exchanged on the basis of their respective NAVs next calculated after your exchange order is received by the Distributor. Currently, the Trust does not charge any exchange fees or charges. Exchanges are subject to the $2,500 minimum initial purchase requirements for Each Fund, except with respect to tax-qualified programs and exchanges effected through the PIMCO Funds Auto–Exchange plan. In addition, an exchange is generally a taxable event which will generate capital gains or losses, and special rules may apply in com-puting tax basis when determining gain or loss. If you maintain your account with the Distributor, you may exchange shares by completing a written exchange request and sending it to PIMCO Funds Distributors LLC, P.O. Box 9688, Providence, RI 02940–0926. You can get an exchange form by calling the Distributor at 1–800–426–0107. (November 2001 Prospectus at 58; February 2002 Prospectus at 96.) The excerpt is followed by the following paragraph:

The Guide provides more detailed information about the exchange privilege, including the procedures you must follow and additional exchange options. You can obtain a Guide free of charge from the Distributor by written request or by calling 1–800–426–0107. See "PIMCO Funds Shareholders' Guide" above. (November 2001 Prospectus at 59; February 2002 Prospectus at 96.)

Finally, Corba has moved for summary judgment on the ground that he had no role in making any misleading statements or omissions and thus cannot be primarily liable under the securities laws. According to the SEC, Corba had authority over certain portions of the Prospectus—specifically, the content of the "fund summary statements." These fund summaries contained information about each fund, including principal investments and strategies; investment objectives; focus of the funds; approximate capitalization range; approximate number of holdings; dividend frequency; principal risks; performance information; and fees and expenses. The SEC states that Corba had authority over these fund summaries by reason of his positions as CEO of PEA, portfolio manager of the Growth Fund, and portfolio manager for the Select Growth Fund. The SEC also states that Corba provided information concerning fund investment objectives and guidelines, fund holdings, and fund capitalization. Corba disputes that he had any authority over the content of any portion of the Prospectus and asserts that he did not provide any information for the Prospectus during the relevant time period. Corba states that PAFM and PAD, not PEA, prepared the Prospectus, that PEA employees' participation in the preparation of the Prospectus was limited to "occasional review or discussion of limited information about PEA or about the funds PEA sub-advised" (Corba R. 56.1 Statement ¶ 20), and that he does not recall any discussion with PAFM about information to be included in the Prospectus in the relevant time period about the funds whose assets he managed.

The SEC states that none of the PIMCO Funds prospectuses or other disclosure documents filed with the SEC disclosed the Canary market timing arrangement or that selected shareholders could make long-term investments in some PIMCO investment vehicles in order to obtain the right to market time PIMCO mutual funds, and in particular that the Prospectus did not disclose that the Select Growth Fund managed by Corba received a $25 million investment from Canary in exchange for market timing privileges. Treadway disputes not only the characterization of the arrangement as a "market timing arrangement," but also that it should have been disclosed, based on his characterization of the policy as discretionary and dependent upon a determination of harm. Corba similarly disputes the characterization of the arrangement as one in which certain shareholders could make long-term investments in exchange for market timing, characterizes the exchange policy as one in which PIMCO retained the right to permit trading not deemed detrimental, and disputes that the arrangement should have been disclosed.

### 2. *Other Evidence of the PIMCO Funds' Market Timing Policies*

The parties also dispute the meaning of certain actions taken by PAD employees to enforce the PIMCO Funds' policies on market timing.

In 2002, PAD froze nearly 400 accounts because of market timing or frequent trading in those accounts. From January 2003 through October 2003, PAD sent 104 warning letters to registered representatives, prohibited 67 registered representatives from selling PIMCO Funds investments, and froze 317 accounts. Treadway does not dispute these facts but states that they are misleading because PAD froze accounts due to trading activity deemed harmful to shareholders, regardless of whether it involved market timing or frequent trading. Corba does not dispute these facts except to state that he knew nothing about PAD's efforts to monitor trading activity.

According to the SEC, PAD, in furtherance of the policy stated in the Prospectus, prevented some shareholders from performing exchanges, purchases, or redemptions; in some cases, this meant stopping trading before six round trips had been reached. PAD monitored trading patterns, including purchase and redemption activity, and in doing so, was able to identify some market timers; when it did so, it sent letters warning that they could not use PIMCO funds to execute market timing strategies. These letters stated that frequent transactions violated Prospectus policies and were detrimental to the PIMCO Funds and harmful to shareholders.[15] In addition, PAD instructed the transfer agent for the PIMCO Funds to block or freeze trades in market timers' accounts. Treadway does not dispute these facts, including that in furtherance of the policy stated in the Prospectus, PAD prevented some shareholders from performing purchases and redemptions, but states that the SEC's statements are misleading in that they omit that certain investors or brokers, including Robert Kargenian ("Kargenian"), Glen Gould ("Gould"), and Bill Orkin ("Orkin"), were permitted to invest in the PIMCO Funds even after they had exceeded six round trips in a 12–month period, because their trading was determined to be not harmful to shareholders. Treadway also adds that PAD automatically sent warning letters to registered representatives who had exceeded six round trips in a 12 month period, without consideration as to whether such trading was harmful to shareholders, and that once the letter was sent, its recipient had the chance to explain to PAD why it was not harmful; if the activities were determined not to be detrimental to shareholders, the warning letter recipient would be allowed to continue to trade. Treadway also adds that the language of many of the warning letters made clear that PAD had discretion in determining whether trading was harmful to shareholders.

Corba also disputes that the warning letters were indicative of harm to shareholders from frequent trading and states instead that they simply were form letters sent to investors only because PAD had noticed a high frequency or magnitude of trades in an account, that those investors

**15.** For example, a May 6, 2002 email to a broker stated,

> Please find attached a letter that has been forwarded to appropriate financial representatives at your firm. The reason you are being sent this letter is so that your firm's back office is aware of PIMCO's effort to discourage and ultimately eliminate market-timing activities that occur within our Funds.

(Email from Isabella A. Albanese, Assistant Trading Manager, Mutual Funds Operations, PIMCO Funds Distributors LLC, to Mark Roth, dated May 6, 2002, attached as Exhibit 59 to Howell Decl.) The letter attached to this email stated,

> This letter is in regard to the frequent transactions that are being executed by you in various accounts at PIMCO Funds: Multi–Manager Series ("MMS").... As indicated in our prospectuses, MMS ... ha[s] reserved the right to refuse exchanges in certain situations. The frequency of transactions executed by you violates these policies.
> The activities in the accounts under your control have been determined to be detrimental to one or more Funds and harmful to our shareholders. The purpose of this letter is to invite you to remove these assets that you have with PIMCO Funds. Should you choose to disregard this advice, then, effective immediately, we, acting for MMS ..., reserve the right with respect to future orders from you—:
> 1. to reject any trade instructions and/or
> 2. to treat a proposed trade as a liquidation (redemption) order for all shares being proposed to be exchanged.

(*Id.* (attached letter from Isabella A. Albanese, Assistant Trading Manager, Operations, PIMCO Funds Distributors LLC, to Dan Reck, A.G. Edwards & Sons Inc., dated May 6, 2002).)

still had an opportunity to contact the PIMCO Funds and explain why their pattern of trading was not harmful to shareholders, and then, only when investors ignored the warning letter, would PAD freeze the account.

According to the SEC, PAD maintained a log listing broker-dealers and registered representatives identified as market timers; the log identified the market timer and the action taken to deter that entity from continuing to engage in timing activity in the PIMCO Funds. While Treadway does not dispute this fact, Corba does in part. According to Corba, the log was kept primarily to assist in detecting accounts and investors engaging in deceptive practices to avoid detection by market timing monitors; those listed in the log had not been conclusively determined to be market timers but merely had been flagged as potentially engaging in timing activity, and those investors who were sent warning letters had the opportunity to explain why their trading was not market timing.

According to the SEC, in some communications PAD interpreted the Prospectus disclosure as a strict prohibition against market timing. For example, in a November 6, 2001 email sent to a broker, one of PAD's employees stated that "PIMCO's policy with respect to market timers is very firm" and "[we] do not allow market timing.... Technically, this can be characterized as more than six round trip exchanges in any twelve month period." (SEC R. 56.1 Statement ¶ 39 (quoting Email from Steve W. Howell to Justin F. Ficken, dated November 6, 2001, attached as Exhibit 53 to Schneir Decl.).) Treadway disputes this statement, stating that the language used in any particular communication is not indicative of the substance or application of the policy; that the six round trip figure was used merely to provide guidance in enforcing the policy

but was not itself the policy; and that many warning letters made PAD's discretion clear. Corba also partially disputes the statement, stating that numerous witnesses have testified that they understood that policy to allow trading that was not deemed detrimental.

### E. *HARM TO SHAREHOLDERS AND TO THE FUNDS*

In May 2002, PAFM advised the PIMCO Funds Board of Trustees of the adverse effect that market timers had on mutual funds. These negative effects included (1) increased trading and brokerage costs; (2) disruption of portfolio management activities; and (3) additional capital gains that increased shareholders' tax liabilities. After receiving this advice, the Board imposed a redemption fee on short-term redemptions and exchanges in certain classes of PIMCO Funds shares, in part to reimburse the shareholders for costs of market timing and to create a disincentive to market timing. The Board did not impose a similar fee on Class A shares, the retail class of shares traded by Canary. However, at a June 20, 2002 Board of Trustees meeting, Treadway received authority to impose redemption fees on Class A shares—the class of shares used by Canary—on a temporary basis prior to the September Board meeting if he believed such action was in the best interests of the shareholders. Nonetheless, due to "systems limitations" at the transfer agent, these redemption fees were not imposed on Class A shares until February 2004.

Treadway adds that (1) he made the presentation to the Board regarding market timing and made the recommendation to impose redemption fees; (2) since the Canary investments were held by PEA in cash, the trading did not cause any of these transaction cost harms to PIMCO;

and (3) the "systems limitations" were outside the PIMCO Funds' control and prevented all mutual funds, not just the PIMCO Funds, from imposing redemption fees on Class A shares at that time.

Corba states that he disputes these assertions; however, he does not specifically controvert them. Instead, he adds additional details, such as that (1) he played no role in advising the Board nor was he aware of the advice given to it; (2) there is no evidence that the adverse effects of market timing discussed with the Board occurred as a result of Canary's trading or that such harms were possible in Canary's situation; (3) the limitations on imposing redemption fees on Class A shares were not overcome by the transfer agent until December 2003, and were imposed on Class A shares in February 2004; and (4) he neither knew about nor played any role in these events.

According to the SEC, Treadway had approved the market timing arrangement with Canary prior to PAFM's advice to the Board, and did not disclose the arrangement during the time the redemption fees were being considered. Instead, Treadway did not disclose his knowledge of the Canary arrangement to the Board until approximately September 2003. Treadway disputes that he approved of any market timing arrangement, and disputes the "implication" that he had a duty to make any disclosure, stating that the Board was responsible for considering overall policy decisions and did not typically discuss trading patterns of individual investors. (Treadway R. 56.1 Response ¶ 43.) Corba similarly disputes that Treadway was obligated to disclose the Canary investments to other trustees, on the basis that the market timing policy, which according to Corba was discretionary, had already been approved by the Board. Corba also states that he had no knowledge of whether or not Treadway disclosed the relationship to other members of the Board.

According to the SEC, some of PEA's managing directors and portfolio managers thought that the Canary trading was disruptive or potentially harmful to the PIMCO Funds and its shareholders. McKechnie testified that the trading was "disruptive" and that it caused him concern about the shareholders of the Innovation Fund. (Deposition of Dennis Paul McKechnie, dated June 16, 2005 ("McKechnie Dep."), at 64:16–65:2; 66:14–25; 82:12–15, attached as Exhibit 97 to Schneir Decl.). Jeffrey Parker ("Parker"), a managing director and portfolio manager for the Target Fund, testified that the trading was "potentially damaging to . . . existing shareholders." (Deposition of Jeffrey D. Parker, dated February 28, 2005, at 210:21–211:4, attached as Exhibit 98 to Schneir Decl.) John Schneider ("Schneider"), a managing director and portfolio manager for two PIMCO Funds that did not participate in the Canary arrangement, testified that "letting one client have a special deal over another client . . . is not in the best interest of the investors in my fund." (Deposition of John Schneider, dated June 29, 2005, at 41:4–13, attached as Exhibit 99 to Schneir Decl.) Treadway does not dispute that these managing directors and portfolio managers made such statements but observes that they did not share their opinions with him. Treadway does dispute, however, that Canary's trading ever had the potential to harm the PIMCO Funds or its shareholders, given that PEA executives were closely monitoring the trading and keeping the investments in cash. Treadway cites to the report prepared by his expert declaring that of the 432 days that Canary traded in the PIMCO Funds, monitoring would have shown that Canary had lost money and that shareholders had benefitted on 423 days of the trading. Treadway also states

that Parker and Gaffney admitted that Canary's trading did not cause any harm to their funds or their shareholders, and that in any event their opinions were not conveyed to Treadway.

Corba strongly disputes that Canary's trading was disruptive or potentially harmful to shareholders, stating that (1) the mere occurrence of market timing does not mean that shareholders are harmed or at risk of harm; (2) limits on Canary's investments were effective at protecting from harm; and (3) the SEC does not distinguish between disruption to portfolio managers and disruption to shareholders. For example, according to Corba, McKechnie did not want to be bothered with managing the additional cash in his portfolio, but did not think shareholders were being harmed.

According to the SEC, the Canary trading was the type of market timing that PAD prohibited for other investors; moreover, when such investors attempted to engage in such trading, they were sent letters stating that such trading was harmful. As an example, the SEC states that when Canary tried to market time a non-PEA PIMCO fund through Cockatoo Capital, a Canary entity that was not a party to the arrangement, PAD sent out a warning letter stating that the frequency of the transactions violated Prospectus policies and was detrimental to the PIMCO Funds and its shareholders. Treadway and Corba both dispute that the Canary trading was the type of market timing prohibited for other investors, for the reasons, already discussed, regarding the allegedly discretionary nature of the market timing policy. Although neither disputes that Canary received a warning letter for the Cockatoo Capital trading, Corba states that because warning letters are not indicative of harm, there was nothing inconsistent about Canary's receipt of a warning letter regarding his trading in Cockatoo

Capital. Corba also states because the other market timers had disclosed their timing prior to engaging in it, PIMCO did not have an opportunity, as it did with Canary, to put procedures in place to protect long-term shareholders from harm.

## F. TERMINATION OF THE CANARY RELATIONSHIP

A series of emails occurred in the time period leading to the end of the Canary relationship:

(1) On March 25, 2002, Cashwell forwarded to Corba a March 10, 2002 email exchange between Stern and Cashwell. The correspondence discusses setting up a trading arrangement, that Cashwell had arranged a meeting for Stern with Gaffney, who managed the Horizon Fund, and that Stern had written to Cashwell after the meeting to state that he "likes the numbers a lot;" that "[g]iven the size of the fund, we will have a tough time doing more than a $2 million allocation right off the bat" but "would likely grow our exposure as the fund grows"—but that "[w]e would, however like to see a little give on the fund trading side. We [w]ere pretty bummed about losing access to PIVAX. While it is small, we like John's fund a lot, and would be very happy if we could have permission to trade up to 1% of it as part of the arrangement." (Email from John Cashwell to Ken Corba, dated March 25, 2002, attached as Exhibit 10 to Schneir Decl.) When Cashwell forwarded this communication to Corba, he wrote that Stern "still wants in on Innovation and would like to invest a bit in Opportunity as part of the deal. He says they are getting ready to use the Growth Fund." (*Id.*) According to the SEC, this email provided an early indication to Corba of the problems with Canary's trading and raised concerns at the fixed-income PIMCO Funds; Corba, however, notes that the factual issues ref-

erenced by the emails are disputed, states that the emails provided no indication that Stern's trading was problematic, and also notes that the fixed-income funds have no relationship with PEA and that he was not involved with directing any investment to the fixed income funds.

(2) On April 26, 2002, Corba, Treadway and others received an email from a PAD employee stating that one of the Canary accounts had already executed five round trips in the Target Fund for the month of April; the email also stated that the Canary accounts "tend[ed] to divide the movement of shares (in or out of the fund[s]) across a couple of days thereby increasing the number of individual transactions hitting the account[s]." (SEC R. 56.1 Statement ¶ 47 (citing Email from Steve Howell to Stephen A. Maginn and Derek B. Hayes, cc'd to Stephen J. Treadway and Ken Corba, dated Apr. 26, 2002, attached as Exhibit 13 to Schneir Decl.).) In response, Treadway instructed a senior PAD officer to formulate a "more precise and limiting definition of what constitutes 4 round trips." (*Id.* (citing Email from Stephen J. Treadway to Steven W. Howell, Stephen A. Maginn, and Derek B. Hayes, cc'd to Ken Corba, dated April 29, 2002, attached as Exhibit 14 to Schneir Decl.).) Treadway does not dispute these statements, but states that they are misleading, pointing out that Corba subsequently explained that the four round trip limit would be an outer limit, not a regular monthly target, and continued to assure him throughout the spring and summer that the trading frequency was an aberration that would not continue. Corba disputes these statements in part by noting that earlier that day, he had sent an email stating that PIMCO "recently clarified with [Stern] that they get 4 round trips per month." (Corba R. 56.1 Response ¶ 47 (citing Email from Ken Corba to Stephen A. Maginn, Derek B. Hayes, Steve W.

Howell, cc'd to Stephen J. Treadway, dated April 26, 2002, attached as Exhibit 13 to Schneir Decl.).)

(3) On April 29, 2002, the same PAD employee sent an email to the broker representatives, Treadway, Corba and others alerting them that Canary's trading had resulted in trade settlement problems: PIMCO had to manually intervene in the settlement process because Canary placed redemption orders before its purchase orders had settled.

(4) On May 17, 2002, Corba sent an email to one of the broker representatives characterizing Canary's trading as "the most opportunistic but extreme form of market timing that [he had] ever seen." (SEC R. 56.1 Statement ¶ 49 (citing Email from Ken Corba to Ryan Goldberg et al., dated May 17, 2002 ("Corba May 17 Email"), attached as Exhibit 11 to Schneir Decl.).) Corba partially disputes these factual issues. The full text of the email, he points out, states, "We are monitoring our agreed upon maximum of 4 round trips per month. The pattern that is most disturbing to me is that you only seem to be interested in being in our funds for a day or two at a time—perhaps the most opportunistic but extreme form of market timing that I have ever seen." (Corba R. 56.1 Response ¶ 49 (citing Corba May 17 Email).)

(5) On May 23, 2002, Corba sent one of the broker representatives an email referring to "another one day transaction" by Canary. (SEC R. 56.1 Statement ¶ 50 (citing Email from Ken Corba to Ryan Goldberg, dated May 23, 2002, attached as Exhibit 70 to Schneir Decl.).)

(6) On May 24, 2002, one of the broker representatives sent an email to Corba stating, "I'm sorry, we did it again. We can't seem to get two up in a row. I hope we can stick around longer in June. This is

killing our performance." (SEC R. 56.1 Statement ¶ 50 (citing Email from Ryan Goldberg to Ken Corba, dated May 24, 2002, attached as Exhibit 71 to Schneir Decl.).)

(7) On June 4, 2002, Corba sent one of the broker representatives an email that stated, "Another one day round trip transaction which is obviously not very satisfactory for us—it's not what we were expecting from this relationship" and "that leaves 3 more for the month." (SEC R. 56.1 Statement ¶ 50 (citing Email from Ken Corba to Ryan Goldberg, dated June 4, 2002, attached as Exhibit 15 to Schneir Decl.).)

(8) On June 5, 2002, one of the broker representatives sent an email trade notification to Corba and others stating, "[h]opefully we can get a rally in the MKTS so we can hold onto these positions for a while." (SEC R. 56.1 Statement ¶ 50 (citing Email from Ryan Goldberg to Ken Corba et al., dated June 5, 2002, attached as Exhibit 72 to Schneir Decl.).)

(9) On June 11, 2002, Corba sent one of the broker representatives and email stating "another one day trade" and that "Treadway is ready to give up this relationship pointing out to me that the last 2 months you have had 6 round trips which violates our agreement." (SEC R. 56.1 Statement ¶ 50 (citing Email from Ken Corba to Ryan Goldberg, dated June 11, 2002, attached as Exhibits 73 and 74 to Schneir Decl.).)

(10) On July 29, 2002, Cashwell sent an email to the broker representatives stating, "[h]eads up on the trading activity for July through 7/26 . . . our records show that you've made 5 round trips in PGWAX [Growth] and PTAAX [Target] and 4 round trips in POPAX [Opportunity]. 4 is ok . . . 5 is not." (SEC R. 56.1 Statement ¶ 50 (citing Email from John Cashwell to Ryan Goldberg, Michael Grady, and Sara Swanson, dated July 29, 2002, attached as Exhibit 75 to Schneir Decl.).)

Corba does not dispute that these emails were sent, but notes that on July 29, 2002, Goldberg sent Cashwell an email stating "sorry, we will be more careful in the future," and that Goldberg and Grady additionally informed him and Cashwell that the frequent trading was aberrant and would subside. (Corba R. 56.1 Response ¶ 50 (citing Email from Ryan Goldberg to John Cashwell, dated July 29, 2002, attached as Exhibit 75 to Schneir Decl.).)

Treadway and Corba also discussed the Canary arrangement several times during time period. According to the SEC, Treadway and Corba discussed the market timing arrangement approximately once per month. Treadway states that Corba misled Treadway during these conversations. Corba states that he and Treadway discussed the Stern arrangement informally and formally at various times but states that the record is ambiguous as to how often such conversations took place.

According to the SEC, around late April or early May 2002, Treadway told Corba that Canary's trading levels and volumes were higher than anticipated and that the Canary accounts were more actively traded than he expected; Corba agreed. Treadway disputes this statement for leaving out the remainder of the conversation; according to Treadway, throughout spring and summer of 2002, Corba consistently reassured Treadway that Stern's frequent trading would not continue and would soon return to a more stable pattern of investment. Corba states that the record is unclear as to whether such a conversation took place. Moreover, Corba states that early on, he believed that Canary's trading was not consistent with what Canary had represented to PIMCO and repeatedly conveyed this frustration to Goldberg and

insisted that Canary adhere to the trading restrictions—citing to the above-referenced emails in which he reminded Canary of the four-round trip limit.

Treadway adds that he had decided to terminate the Canary trading in June 2002 because it was "more a pattern of day-trading" and not what Corba had promised it would be (Treadway R. 56.1 Response ¶ 51.); however, after being assured by Corba that the frequency of the trading would slow down and that the investment patterns would become those of long-term investors, he decided not to freeze the accounts at that time.

In or around late August or early September 2002, Treadway and Corba decided to terminate the Canary arrangement. However, with Treadway's and Corba's knowledge, Canary continued market timing—at least in the Target and Growth funds—until at least November 2002. In October 2002, the Select Growth Fund merged with the Growth Fund. Just prior to the merger, on October 11, 2002, Canary redeemed its investment from the Select Growth fund. Prior to the merger, Treadway believed that Canary owned more than 25 percent of the Select Growth Fund. Canary continued timing activity until around November 7, 2002, at which point essentially all funds were withdrawn from the Target and Growth funds. However, Canary continued to time the Opportunity Fund until on or around April 3, 2003, and kept its investment in the Horizon Fund until on or around May 31, 2003.

According to Treadway, he ordered that Canary cease trading in all PIMCO Funds by October 31, 2002, and chose this time period because he feared a lawsuit by Stern, who had lost almost $9 million to date, because the trading had not harmed the funds or other investors, and because Stern owned more than 25 percent of the Select Growth Fund shares, so his with-drawal could have affected the tax-free status of the merger if it took place after that date. Treadway disputes that he had any knowledge of the trading that took place after October 31, 2002.

In addition, Treadway adds that a separate arrangement between Stern and Gaffney allowed Stern to continue trading in those funds after October 31, 2002; while Gaffney and Cashwell had knowledge of this arrangement, trade notifications were not sent to Corba or PAD operations personnel, indicating an intent to hide the trading from PAD and Treadway, and Treadway had no knowledge of this arrangement.

Corba partially disputes these facts. He states that a target date of mid- to late October 2002 was set because this date coincided with the end of PEA's fiscal year on October 31, 2002. He further states that he and Treadway decided to stop the trading not due to harm to shareholders, but because they "believed that Stern had proven he was not going to follow through on his representations." (Corba R. 56.1 Statement ¶ 52.) Corba also disputes the suggestion that he authorized or had advanced knowledge of Stern's continued trading past the established termination date and objects to the term "sticky assets." Finally, he states that the Opportunity and Horizon Fund investments were facilitated exclusively by Cashwell and Gaffney, that he expected all Stern's investments to be withdrawn in October 2002, and that he had no knowledge of continued investments until after the fact.

G. *ADDITIONAL FACTS*

To this extensive record, Treadway has added several additional allegations, not addressed by the SEC, that appear to implicate Corba and Cashwell. He states that Corba was motivated to agree to the Canary relationship because if his Select

Growth Fund was enlarged, it would reach the threshold necessary to be listed in the *Wall Street Journal.* He also adds several statements suggesting that PEA sent its mutual fund portfolio holdings to Canary earlier than it sent them to other investors—monthly, with only a day's lag time, rather than the usual end of every quarter when the information was already stale. He further states that Corba has denied having knowledge of these disclosures at least until after the Canary relationship ended.

## III. MOTION TO STRIKE THE KOHLER DECLARATION

Corba moves to strike the declaration of Aaron S. Kohler ("Kohler"), an SEC staff accountant whose declaration (the "Declaration") was submitted in support of the SEC's motion for summary judgement. The Declaration states that Canary made a total of 110 round trips in the PIMCO Funds with a total trading volume of over $4.5 billion. The analysis is summarized in three spreadsheets attached to the Declaration.

Corba argues that Kohler is offering expert testimony and that the SEC did not make any expert disclosure regarding Kohler pursuant to Federal Rule of Civil Procedure 26(a)(2) ("Rule 26"). He requests that the Court either strike the Declaration or order the SEC to comply with Rule 26 by submitting an expert report and making Kohler available for deposition. If the Court determines that Kohler is not offering expert testimony, Corba requests that the Declaration be stricken because Kohler was not disclosed as a fact witness.

According to Corba, Kohler's conclusions necessarily are the result of specialized knowledge and expert analysis. Moreover, Corba argues that Kohler uses definitions and assumptions that conflict with those used in the Prospectus and those of the expert accounting firm (Deloitte & Touche) hired by PIMCO during the SEC investigation. For example, although the SEC states that Kohler's definition of "round trip" tracks the Prospectus, Corba argues that Kohler's definition is broader than that in the Prospectus, because Kohler describes round trips as involving exchanges or redemptions "out of the fund" and then back into the fund, whereas the Prospectus defines a round trip as an exchange of shares "for shares of a different PIMCO Fund" and then back into the original fund. Corba further argues that the basis for Kohler's assumptions is undisclosed. For example, Kohler states, without explaining why, that "in [his] analysis the size of the exchange or redemption did not matter." Finally, Corba points out that Kohler's Declaration provides results different from those of the other experts: whereas Kohler calculated 110 round trips, the SEC's disclosed expert, Sheridan Titman ("Titman"), calculated 109 rounds trips, and Deloitte & Touche, who had been hired by the SEC during the investigation of this matter, calculated 99 round trips. That two other experts performed calculations of "round trips"—yet reached different results demonstrates, according to Corba, that Kohler's Declaration is not an elementary analysis.

In response, the SEC argues that the Kohler Declaration is not expert testimony but merely a summary of its evidence relating to Canary's trading activity, and that the spreadsheets are summary documents allowed under Federal Rule of Evidence 1006. According to the SEC, Kohler did not employ specialized knowledge, but rather, "any lay person" could have reviewed the same evidence and provided the same conclusions. The SEC argues that Kohler's definition of "round trip" is

not the product of any specialized knowledge, but rather tracks the Prospectus language, and that his analysis simply applies the Prospectus language to the SEC's evidence. Kohler reviewed brokerage statements for Canary accounts and compared and reconciled the information in those statements with PIMCO Funds-provided trading data "to ensure accuracy." (Pl. Securities and Exchange Commission's Mem. of Law in Opp'n to Def. Corba's Mot. to Strike the Declaration of Aaron Kohler, dated November 17, 2005, at 1.)

■ Addressing this dispute first, the Court finds that Kohler's Declaration does not set forth expert opinion. Rather, Kohler is simply an SEC employee providing his view of the facts as a summary of certain evidence and as an aid to the Court. His Declaration, which simply adds up the number of round trips executed by Canary in PIMCO Funds investments, is more akin to a summary document than an expert analysis. In this regard, the Court notes that while Titman does provide an estimate of the number of round trips, this calculation is based on looking at the trading data, and that his expert analysis involving statistical and quantitative analyses focuses on assessing the "nature of [Canary's] timing activities and ... quantify[ing] their impact"—*i.e.,* whether the strategy was successful, whether Canary made gains or losses, and thus whether there was any harm or potential harm to shareholders from this trading. The report submitted by Corba's expert, Robert Comment ("Comment"), similarly focuses on whether Canary's trading was harmful, not on a calculation of round trips. Corba's dispute as to whether the Prospectus was misleading in light of Canary's trading is not based on an alternative calculation of round trips put forth by a competing expert, or even a fact witness. Rather, Corba uses the

SEC's calculation of 93 purchases and redemptions and seven exchanges and insists that the purchases and redemptions do not count as round trips under the Prospectus. The meaning of the Prospectus and whether it applied to Canary's trading is a *fact* issue, not an issue requiring expert opinion. That Corba disagrees that Kohler applied the Prospectus language to Canary's trading is a contested issue of fact concerning whether the Prospectus was misleading, not an issue of competing expert analyses, and this dispute can be brought out upon cross-examination of a fact witness. The Court therefore denies Corba's motion to strike the Kohler Declaration.

To the extent that Corba contests Kohler's Declaration because Kohler was not properly disclosed as a fact witness, that challenge can be addressed before trial through an in limine motion.

## IV. MOTIONS FOR SUMMARY JUDGMENT

### A. *LEGAL STANDARD*

To prevail on a motion for summary judgment, the moving party must demonstrate that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court ascertains which facts are material by considering the substantive law of the action, for only those "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Even if a dispute over material facts exists, summary judgment will be granted unless the dispute is "genuine," *i.e.,* "there is suffi-

cient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505. In determining whether genuine issues of material fact exist, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223–24 (2d Cir.1994).

When deciding cross-motions for summary judgment, the standard to be applied is the same as that for individual summary judgment motions, and the court must consider each motion independent of the other. *See SEC v. Mandaci*, No. 00 Civ. 6635, 2004 WL 2153879, at *7 (S.D.N.Y. Sept.27, 2004).

For purposes of summary judgment, the Court's role is to determine whether triable issues of fact exist based on the entire record the parties have presented to the Court, and not to resolve such disputed matters. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *Gibson v. Am. Broad. Cos.*, 892 F.2d 1128, 1132 (2d Cir.1989).

## B. *DISCUSSION*

### 1. *Section 10(b) of the Exchange Act and Rule 10b–5*

The SEC has moved for summary judgment against Treadway and Corba on its claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) ("Section

10(b)"), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5. Corba has also moved for summary judgment.

■ To establish liability under Section 10(b), the SEC must show that (1) the defendant made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device;[16] (2) with scienter; (3) in connection with the purchase or sale of securities. *PIMCO I*, 341 F.Supp.2d at 463–64 (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir.1999)). A misrepresentation is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *Id.* at 464 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). As detailed in *PIMCO I* and *PIMCO II*, a defendant can be liable under Section 10(b) for material misstatements or omissions as long as he personally made the misleading statement or omission, was "primarily responsible" for communications with investors and industry analysts, and "was involved in the drafting, producing, reviewing and/or disseminating the false/misleading statements." *PIMCO II*, 354 F.Supp.2d at 315 (internal quotations omitted); *see PIMCO I*, 341 F.Supp.2d at 466–67.

■ Moreover, even if the SEC cannot establish primary liability, it can establish aiding and abetting liability by demonstrating (1) a securities violation by a primary wrongdoer; (2) knowledge of the violation by the aider and abettor; and (3) substantial assistance by the aider and abettor in the primary violation. *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983).

---

**16.** However, in *PIMCO I* this Court held that Treadway and Corba could not be held primarily liable for use of a fraudulent device, *see PIMCO I*, 341 F.Supp.2d at 468; thus, the SEC's primary liability claims must be predicated upon whether the defendants made material misstatements or omissions.

*(a) Disputed Issues of Fact Exist as to Whether a Material Misrepresentation or Omission Was Made*

■ The Court finds that genuine issues of material fact exist as to whether the PIMCO Funds Prospectus and similar disclosure documents contained material misrepresentations or omissions. According to the SEC, the language in the Prospectus, Statements of Additional Information, and Shareholder Guides disclosures contained material misrepresentations because they gave the clear impression to investors that PIMCO Funds investments were hostile to market timing and were intended for use by long-term investors, at the same time that PIMCO had a secret market timing arrangement with Canary. The SEC also states that these disclosures are materially misleading because they did not disclose that shareholders could make long-term investments in certain PIMCO investment vehicles (such as the Select Growth Fund or the Horizon Hedge Fund) in exchange for opportunity to frequently trade in the mutual funds.

However, the meaning of the Prospectus, and thus what it represented to investors and potential investors, is in dispute. Treadway and Corba both point to evidence that, they argue, suggests that the Prospectus set forth a policy under which PIMCO had discretion to allow market timing if it determined that such trading was not harmful to shareholders. Treadway and Corba point out that the Prospectus states merely that PIMCO "reserves the right" to refuse certain exchanges "if, in the judgment of PIMCO Advisors," the activity is deemed detrimental, and that a pattern of market timing activity "may" be deemed detrimental. (November 2001 Prospectus at 59; February 2002 Prospectus at 96.) According to Treadway and Corba, this language does not indicate a blanket ban on market timing or a strict anti-market timing policy, but rather, a policy indicating that PIMCO Funds might allow market timing if in its judgment it determined that such activity was not harmful to shareholders. Buttressing this interpretation is the testimony of Gaffney and Stephen Maginn ("Maginn"), a PIMCO managing director. Gaffney stated that "if there was trading activity which was determined to be detrimental to the fund, then the distribution people would be able to stop that trading." (Deposition of Michael F. Gaffney, dated March 21, 2005, at 32, attached as Exhibit 101 to Schneir Decl.); Maginn stated that the policy detailed in the Prospectus was a "catch all type thing ... we reserve the right to refuse exchanges ... if we, for whatever reason, decide this is going to be an adverse transaction on behalf of the investors" and "if it was deemed to be detrimental to the shareholders, then that would be the overriding concern in this paragraph." (Investigative Testimony of Stephen Maginn, dated February 10, 2004, at 30, 33, 38, attached as Exhibit 114 to Schneir Decl.) Finally, Treadway and Corba point to evidence suggesting that other individuals—namely, Kargenian, Orkin, and Gould—were allowed to market time, and that investors, after being sent warning letters, could be allowed to continue such trading if they could explain how the trading was not harmful.

The meaning of the Prospectus put forth by Treadway and Corba—that the PIMCO Funds allowed market timing if it was not harmful—and therefore that the Prospectus was not misleading as to Canary's trading, is not the only conclusion to draw from this evidence and other evidence before the Court. The language in the Prospectus could also be read to suggest that the PIMCO Funds discouraged all market timing, particularly in light of PAD's actions taken to stop market timing. Treadway's self-professed vigorous opposition to

market timing, the numerous "kick-out" letters stating that frequent trades violated Prospectus policies, and other PAD actions, including the freezing of accounts, suggest that the PIMCO Funds represented that it had a strict anti-market timing policy. That the PIMCO Funds' internal documents show that three other individuals may have been allowed to market time might even be further evidence that the Prospectus was misleading. Nonetheless, there is sufficient evidence to prevent summary judgment on this issue. If the PIMCO Funds policy could be interpreted as being one of discretion, in which PIMCO Funds monitored all trades, including those characteristic of market timing, and determined on a case-by-case basis which trades were detrimental and which were not, then perhaps the disclosures were not misleading in light of the Canary arrangement. This determination in turn depends on other issues of disputed fact.

In *PIMCO I* this Court held that even if the Prospectus conveyed the meaning put forth by Treadway and Corba—that PIMCO did not formally prohibit market timing under all circumstances—its language was still misleading under the circumstances because

> at the same time that PIMCO assured investors that it would act to stop market timing activities if they were deemed "detrimental to the Trust or a particular Fund," and that the company "limit[ed] the number of 'round trip' exchanges an investor may make," PIMCO was negotiating a preferred market timing arrangement with Canary that . . . harmed several of the PIMCO Funds *with the knowledge* of Treadway and Corba, and that did not apply the same market timing limits to Canary that applied to all other PIMCO Funds investors. Thus, even if the Canary arrangement was not strictly prohibited by the alleged disclosures, the disclosures were clearly misleading *under the circumstances* because they informed investors that the management of the PIMCO Funds would act to protect the interests of long-term investors from market timers at the same time that the Funds were, under the direction of Treadway and Corba, allegedly facilitating an undisclosed market timing arrangement.

341 F.Supp.2d at 464 (internal citations omitted) (emphasis in original). As the procedural posture of the case in *PIMCO I* was a 12(b)(6) motion, the Court assumed all the allegations in the complaint to be true—including that Treadway and Corba had knowledge of and facilitated the arrangement, and that the arrangement risked harm to long-term shareholders. Now, however, the Court is faced with summary judgment submissions that set forth material issues of fact as to these assumptions. The resolution of these issues involves weighing and assessing the credibility of the evidence put forth, and it is not within the authority of the Court at the summary judgment stage to perform that function, but rather, to assess whether a genuine issue exists for trial. Treadway's and Corba's knowledge of and role in facilitating the arrangement is discussed below in the section on scienter, and risk of harm to shareholders in the section on materiality.

Corba also suggests that, even if the PIMCO Funds did have an anti-market timing policy, the Prospectus put forth language suggesting that this policy applied only to "round trip exchanges," that is, transactions in which shares of a fund are exchanged for shares of another fund, and then back into the original fund, and not to round trips conducted through purchases and redemptions. Since the majority of Canary's round trips were purchases and redemptions, not exchanges, Corba argues that the Prospectus was not misleading as

to Canary's trading. To support this assertion, Corba points out that the language that discouraged market timing is in the section of the Prospectus entitled "Exchanges" and that the sections dealing with purchases and redemptions do not contain similar language.

It is possible, drawing all inferences in favor of Corba as the nonmovant, that since the anti-market timing language is embedded in the "Exchanges" section of the Prospectus, and expressly limits only round trip "exchanges," that the Prospectus could reasonably be read to disclose only that excessive exchanges, not frequent purchases and redemptions, were banned, and thus that the language did not apply to the majority of Canary's trades. On the other hand, the Prospectus can also reasonably be read as discouraging market timing itself, with round trip exchanges set forth only as a specific example. The SEC points to evidence suggesting that the policy was enforced as to both purchases and redemptions *and* exchanges. For example, emails and testimony from Howell, an Operations Manager at the PIMCO Funds, indicate that market timing and harmful activity warranting freezing of trading accounts included a broader range of activity than exchanges and included purchases and redemptions. Clearly then, even if the language in the Prospectus warrants the interpretation put forth by the SEC, a material issue of fact exists as to whether it was materially misleading in light of Canary's actions.

Finally, whether the Prospectus was misleading for not disclosing that shareholders could make long-term investments in certain PIMCO Funds vehicles in exchange for the opportunity to frequently trade in the mutual funds cannot be determined on summary judgment based on material issues of fact that exist as to whether there was even a quid pro quo. The timing of the $25 million investment into Corba's own Select Growth Fund, the withdrawal of part of this investment after Canary was forced to stop trading in the Innovation Fund, and the subsequent additional investment into the Horizon Fund, along with the waiver of the lock-up period for the Horizon Fund investment in the event the timing relationship ended, suggest that such a quid pro quo existed, and the Brean Murray brokers suggest that such an exchange was at least "implied if it wasn't said." (Deposition of Michael Grady, dated May 12, 2005, at 149–50, attached as Exhibit 109 to the Schneir Decl.) However, Corba testified that it was a "global" relationship, and there is at least some evidence that the investments in the Select Growth and Horizon Hedge funds were made on the basis of investment merit rather than as an exchange for trading capacity. (*See, e.g.,* Corba R. 56.1 Response ¶ 9 (pointing to, among other things, testimony of Gaffney that the Horizon Fund investment was based on strength of the Horizon Fund and was not linked to timing capacity in other funds).) Thus, the exact nature of the Canary arrangement is in dispute.[17]

### (b) Material Issues of Fact Exist As to Whether Corba Made a Material Omission

■ The Court must deny Corba's motion for summary judgment because mate-

---

**17.** The Court notes that the question of whether the Canary relationship was a global relationship or a quid pro quo may not matter with respect to whether the Prospectus was misleading. A fact finder may reasonably conclude that the lack of disclosure of the Canary relationship rendered the Prospectus misleading based solely on the market timing aspect of the Canary relationship. However, the nature of the relationship may be relevant with respect to the motive and opportunity element of the scienter inquiry and in determining whether there was a breach of fiduciary duty under the Investment Company Act.

rial issues of fact exist as to whether he made a material omission.

In *PIMCO II*, this Court held that Corba could be charged with primary liability only for material omissions, not for material misrepresentations.[18] This conclusion followed from the Court's finding that Paragraph 39 of the Amended Complaint—the paragraph added by the SEC to correct the original complaint's lack of allegations charging Corba with drafting or communicating the fraudulent statements at issue—did not allege that Corba was primarily responsible for the Prospectus disclosures concerning market timing that could be considered material misrepresentations, nor did the SEC point to other specific statements contained in the portions of the Prospectus for which Corba was allegedly primarily responsible that were allegedly misleading. Instead, the Court held that Corba could be charged only with material omissions, for failing to disclose the Canary relationship, and its potential effect on PIMCO funds advised or managed by PEA or himself personally, in those sections of the Prospectus for which he was allegedly primarily responsible. *See PIMCO II*, 354 F.Supp.2d at 316 n. 3. The Court held that, in Paragraph 39, the SEC had adequately alleged that Corba was primarily responsible for portions of the PIMCO Funds' Prospectus, and that he made material omissions in those portions of the Prospectus by failing to use them to disclose the Canary relationship and its potential detrimental effect on several PEA-advised funds. Specifically, the Court held that

Corba could be found to have personally committed securities fraud by failing to include in the portions of the Prospectuses for which he had primary responsibility information concerning PEA's relationship with Canary that he knew or should have known was material to the public. Further ... Corba, who allegedly negotiated the Canary relationship and had extensive dealings with Canary as CEO of PEA and manager of two funds affected by the relationship, was in a unique position to disclose the Canary arrangement, and its effect on PEA-advised funds, in sections of the Prospectuses for which he had primary responsibility.

*Id.* at 317.

■ A failure to disclose material information is actionable only when the defendant had an affirmative duty to disclose those facts. *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 179 (2d Cir. 2001); *In Re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993). "One circumstance creating a duty to disclose arises when disclosure is necessary to make prior statements not misleading." *Time Warner*, 9 F.3d at 268. Thus, as to Corba's primary liability, the relevant question is whether Corba had a duty to disclose information necessary to make the fund summaries not misleading.[19]

Corba forcefully argues that he had no role in preparing any portion of the Prospectus. According to Corba, PAFM and PAD, not PEA, drafted, prepared and disseminated the Prospectus. At most, Cor-

18. However, in *PIMCO I* the Court left open the possibility that Corba could be charged with aiding and abetting liability for substantially assisting in the issuance of these misleading disclosures or by failing to correct statements that he knew or should have known were misleading. 341 F.Supp.2d at 467, 468.

19. Corba devotes some portion of his papers to arguing that nothing in the record supports the inference that he personally made misstatements that he knew were misleading and would be communicated to the public. However, as set forth in *PIMCO II*, the SEC's case against Corba is based on material omissions, not misstatements.

ba asserts, he provided limited information in the "fund summary statements" section of the Prospectus—a section which did not contain language regarding market timing policies—but not during the relevant time period. Moreover, according to Corba, he provided only "basic, general" fund characteristics such as approximate number of holdings, approximate capitalization range, or the focus of the fund. (Mem. of Kenneth W. Corba in Supp. of His Mot. for Summ. J., dated October 6, 2005 ("Corba SJ Mem."), at 17.) The remainder of the information in the fund summary statements, such as principal risks, performance, and fees and expenses, came from others. Moreover, he argues, portfolio managers did not supply this information on a regular basis but would do so only when a fund was created or when its reported characteristics changed.

However, the SEC has presented evidence that PIMCO Funds portfolio managers did contribute information to the Prospectus. Newton Schott, the general counsel of PAD and PAFM and Chief Legal Officer of PIMCO Funds, testified that PEA officers and employees "occasionally would review and comment upon descriptions of the Funds' investment policies and restrictions, the investment strategies employed by PEA, and information about PEA contained within the PIMCO Funds' prospectus and statement of additional information." (SEC R. 56.1 Response ¶ 18.) Schneider, a managing director of PEA and portfolio manager of the Renaissance Fund, a fund not involved in the Canary arrangement, testified about two instances in which he was the "driver" behind a need for a change in the Prospectus. (Id. ¶ 21.) [20] Jeffrey Parker, portfolio manager of the Target Fund, testified that he was

periodically shown the Prospectus to determine whether it was accurate and whether changes should be made to the language. (Id.) Corba himself testified that he provided this type of information for inclusion in the Prospectus. (Id. ¶ 17.) That some portfolio managers never discussed the fund summary characteristics because the characteristics did not change, and that Corba did not speak with Phillip Neugebauer ("Neugebauer"), the PAD employee responsible for discussing changes to fund characteristics with PEA portfolio managers, does not warrant summary judgment for Corba, because it presumes that Corba had no reason to speak with Neugebauer, when the SEC has presented a triable issue of fact that Corba, with his unique knowledge of the Canary arrangement and how it affected the Growth and Select Growth funds that he managed and the other funds sub-advised by a company of which he was the CEO, may have had reason and indeed a duty to speak with Neugebauer regarding omissions in the Prospectus.

Although Corba disputes that he was in a unique position to disclose the Canary arrangement, in that others, including Treadway, and Howell and Derek Hayes ("Hayes") (PAD employees who monitored trading activity), were aware of the relationship, triable issues of fact exist as to how much Treadway was aware of the relationship, and in addition, Howell and Hayes may not have known as much about the relationship in that the SEC has set forth a triable case that Corba negotiated the relationship with the Brean Murray brokers and with Stern and was privy to all its details. Moreover, as CEO of PEA, the sub-adviser at which *all* of the Canary trading occurred, and as portfolio manager

**20.** These two examples included a change in the number of securities, and a change in the amount of foreign securities. (*See* SEC R.

56.1 Response ¶ 20 (citing Schneir Decl. Ex. 99 (Schneider Dep. at 31:2–3, 31:6–18)).)

of two of the funds in which trading occurred, Corba owed a fiduciary duty to those funds and their shareholders, and thus may have been in a unique position to disclose the Canary arrangement.

Corba also argues that there is no evidence that any portion of the fund summaries was false or misleading, and therefore nothing required correction. He states that none of the fund characteristics specific to the funds he managed changed during the relevant period. Yet there is a triable issue of fact as to whether the fund characteristics in those fund summaries changed or were rendered misleading by the advent of the Canary relationship. The fund summaries, which presumably serve the purpose of letting a shareholder know the basic parameters and risks associated with his or her potential investment, included basic characteristics such as holdings and fund size, as well as information on risks and fees. Presumably a shareholder wanting to know the risks associated with an investment in a particular fund would look to these sections. Thus, the fund summaries for the funds in which Canary traded may have been rendered materially misleading for not disclosing that those funds were subject to an arrangement allowing certain investors to actively trade those funds and thus creating a risk of harm—specifically the risks associated with market timing. It may also be that the portion of the fund summary statements detailing fees and expenses was misleading for omitting that additional fees and expenses could be generated by Canary's trades.

*(c) Material Issues of Fact Exist As to Whether the Misrepresentations or Omissions Were Material*

■ A misrepresentation or omission is material when a reasonable investor would have considered it significant in making investment decisions. *See Basic,* 485 U.S. at 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161–62 (2d Cir.2000). Thus, such misrepresentation or omission is material when there is a " 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " *Basic,* 485 U.S. at 231–32, 108 S.Ct. 978 (quoting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); *Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir.2002).

To the extent that the Court is asked to weigh questions of materiality, the Court may grant summary judgment only when the omissions or misrepresentations in questions are "so obviously [important or] unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Castellano,* 257 F.3d at 180 (internal quotation omitted); *SEC v. Save the World Air, Inc.,* No. 01 Civ. 11586, 2005 WL 3077514, at *8 (S.D.N.Y. Nov. 15, 2005).

■ Here, the Court cannot grant summary judgment on the issue of whether the misrepresentations or omissions were material for two reasons. First, as discussed above, genuine issues of material fact exist as to whether there was even a misrepresentation or omission. Second, even if the disclosure documents contained misrepresentations or omissions by suggesting either that the PIMCO Funds was hostile to and would discourage market timing, or that PIMCO Funds would stop "detrimental" market timing, while at the same time secretly allowing Canary to market time the funds, whether such misrepresentation or omission is material turns on whether an investor would have considered that non-disclosed information

significant in making investment decisions, and the significance of Canary's trading is in dispute. A reasonable investor would want to know of any risks or potential harms associated with his or her investment. In the case of a mutual fund, such risks and potential harms include increased trading and brokerage costs; disruption of portfolio management activities, including hindering the ability of mutual fund managers to act in the best interests of fund investors seeking to maximize long-term investment gains; and additional capital gains that increase shareholders' tax liabilities.

Here, whether such risks of harm were present with Canary's trading is disputed.[21] The parties have retained competing experts who put forth different theories as to whether a risk of harm existed from Canary's trading. Titman, the SEC's expert, has suggested that allowing market timers into mutual funds inherently poses risks to the non-market timing long-term investors, because any gains from the short term trading are derived at the expense of the long-term shareholders. (*See* Expert Report of Sheridan Titman, PhD, dated June 27, 2005, at 15–17, attached as Exhibit 38 to the Declaration of Samuel Bonderoff, dated Nov. 10, 2005 ("Bonderoff Decl.").) In contrast, Treadway's expert, David Gross, suggests that because of the limits put in place on Canary's trading, no risk of harm existed. (*See* Expert Witness Report of David B. Gross on Behalf of Stephen J. Treadway, at 14–19, attached as Exhibit 38 to Bonderoff Decl.) Even beyond the expert reports, Treadway and Corba both suggest that the limits on the Canary investments—no more than three percent in each fund, keeping the investments in cash, limiting

the number of round trips per month to four, and monitoring the trades through email notifications—eliminated any risk of harm. Whether such limits reduced or eliminated a risk of harm is therefore a factual dispute to be resolved at trial.

Indeed, factual disputes regarding whether these limits prevented any risk of harm abound. For example, Treadway and Corba suggest that the advance notification of trades would eliminate any risk of harm. Yet the SEC points out that the trade notifications were generally sent after the trades had already been made; thus, the harm would already have been done. The SEC also points to testimony from McKechnie suggesting that trade notifications would not eliminate the disruptive nature of the trading. Similarly, although defendants suggest that keeping the Canary investments in cash minimized any disruption, and Corba states that these cash levels "never deviated from industry standards" (Corba R. 56.1 Statement ¶ 28), there is competing evidence that the money was kept in cash due to the rapid and short-term nature of the trades, and that keeping it in cash may have been harmful rather than helpful.

Additional evidence that Canary's trading posed a risk of harm to the funds and to shareholders exists, but is contested by the defendants. For example, McKechnie forced Canary to stop trading in the Innovation Fund based on the trading's disruptive nature, but Corba points to testimony of McKechnie suggesting that the trading did not pose any risk of harm but simply interfered with McKechnie's own "unique, meticulous strategy for short-term cash management." (Corba R. 56.1 Response ¶ 16.) The Court notes, however, that when McKechnie was asked if he was con-

---

**21.** The parties also dispute whether any harm actually occurred, but this dispute is not decisive, as a reasonable investor would want to know information regarding potential risks, even if, in hindsight, such risks did not come to pass.

cerned about shareholders in the Innovation Fund, he replied, "Yes, in the sense that my duty was to do the best I could and I felt that this arrangement would make it difficult for me to do the best I could and difficult to impart my viewpoints precisely on my portfolio." (McKechnie Dep. at 64:20–65:2.) While this testimony strongly suggests that McKechnie's concerns extended beyond any idiosyncratic cash management strategies that he may have had, to concern for the performance of the fund and the resulting impact on shareholders, drawing, as the Court must, *all* inferences in favor of the nonmovant, it is possible to infer that his concerns pertained to consequences to administration of the funds that did not affect fund performance.

Similarly, at least once, in April 2002, PIMCO Funds had to manually intervene in the settlement process because Canary placed redemption orders before its purchase orders had settled. This action suggests harm to the funds caused by Canary's trading. Yet Treadway and Corba point to some evidence suggesting that the settlement problems were purely administrative and did not cause any harm.

Finally, Corba states that his May 17, 2002 email characterizing Canary's trading as "the most opportunistic but extreme form of market timing that [he had] even seen" (SEC R. 56.1 Statement ¶ 49 (citing Corba May 17 Email)) does not reveal concern over risk of harm to shareholders, but rather, mere "surprise at the unexpectedly short-term nature of Stern's trading." (Corba R. 56.1 Response ¶ 49.)

Although it would not be unwarranted for the Court to determine that a reasonable fact finder could conclude that Treadway and Corba protest too much, the Court cannot draw that inference at this point, as it would require weighing credibility and evidence in a manner not proper on a summary judgment motion. Drawing, as it must, all inferences in favor of the nonmovants, the Court concludes that the evidence set forth above raises triable issues of fact as to whether a risk of harm existed to the funds and shareholders from Canary's trading, and thus whether the nondisclosure of Canary's trading was a material misrepresentation or omission.

*(d) Scienter*

■■■■ To establish scienter in a securities fraud case, plaintiffs must demonstrate either (1) that defendants had motive and opportunity to commit fraud, or (2) conscious misbehavior or recklessness. *Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001); *Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir.2000). Motive requires showing "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures." *Kalnit,* 264 F.3d at 139 (internal quotations omitted). This potential gain must be a "concrete and personal benefit to the individual defendants resulting from the fraud" beyond desire for the corporation to appear profitable or desire to keep stock prices high to increase officer compensation. *Id.* Opportunity entails "the means and likely prospect of achieving concrete benefits by the means alleged." *Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir.2000). Conscious misbehavior or recklessness is demonstrated by conduct that is "highly unreasonable" and "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit,* 264 F.3d at 142 (quoting *In re Carter–Wallace, Inc. Secs. Litig.,* 220 F.3d 36, 39 (2d Cir.2000) (internal quotations omitted)). An "egregious refusal to see the obvious, or to investigate the doubtful" can also establish

recklessness. *Novak,* 216 F.3d at 308; *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 269 (2d Cir.1996). Recklessness typically is established when plaintiffs demonstrate (1) that defendants were aware of facts or had access to information contradicting their public statements and thus that they knew or should have known they were misrepresenting material facts related to the corporation; or (2) facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud. *See Novak,* 216 F.3d at 308. In such situations, however, the conduct must still rise to the level of "highly unreasonable or extreme misconduct, rather than simply to mere deviations from standards of ordinary care." *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 422 (S.D.N.Y.2001) (citing *Novak,* 216 F.3d at 309).

"The Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences." *Press v. Chem. Inv. Serv. Corp.,* 166 F.3d 529, 538 (2d Cir.1999). Whether a given intent existed is generally a question of fact. *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 194 (2d Cir. 1998); *SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1467 (2d Cir.1996).

The Court finds that genuine issues of material fact exist as to the scienter of both Treadway and Corba.

### (i) *Treadway's Scienter*

 According to the SEC, Treadway's scienter can be inferred from his January 2002 meeting with Corba, when he was told that Stern "was interested in 'active trading' that 'could potentially run afoul' of the PIMCO Entities' market timing policies"' and approved the relationship, at the same time having knowledge of the Prospectus language on market timing and even signing the registration statements containing such disclosures. (SEC R. 56.1 Statement ¶ 14.) Moreover, his scienter can be further inferred from additional specific information about Canary's trading that was communicated to him. For example, Treadway received a February 12, 2002 email regarding the initial Canary transactions; while the email's contents do not explicitly indicate the nature of the Canary arrangement, and there is a dispute as to the implications to be drawn from the email, it is reasonable to infer that the email put Treadway on notice that certain large amounts of trading involving allocations to new funds had begun. Moreover in April 2002 he received an email from PAD reporting that Canary had executed five round trips; Corba explained to him that the limit was four, and that this was an outer limit, and in response, Treadway directed PAD to develop a more "limiting" definition of round trips. In addition, Treadway and Corba met periodically to discuss the Canary arrangement. Finally, on April 29, 2002, Treadway received an email from PAD notifying him of trading settlement problems caused by Canary's trades. Yet he did not direct the trading to stop until October 2002.

Certainly if this evidence was not disputed, *and in addition* the meaning of the Prospectus was not disputed, these circumstances would strongly suggest that Treadway knew or should have known of PIMCO's anti-market timing policies and orientation toward longer-term investors, at the same time that he approved the Canary arrangement, that he knew that Canary was conducting activity in violation of PIMCO policy, and that he was regularly made aware of the harmful effects of Canary's trading activities but nonetheless failed to disclose or stop them for more than a year after the trading began. Treadway's continued acquiescence in the

Canary arrangement while being the signatory of a document discouraging market timing suggests at least a reckless refusal to see the obvious, if not more.

However, juxtaposed against each of these pieces of evidence is evidence creating disputed issues of fact. For example, Treadway disputes that Corba even mentioned market timing during their initial meeting; according to Treadway, Corba did not tell him that Stern intended to invest through a hedge fund or Canary, which would have been a red flag to Treadway that Stern was a market-timer, nor did Corba tell Treadway that he was giving Stern permission to make four round trips per month. Instead, by Treadway's account, Corba told Treadway that Stern, a member of a reputable New York family, wanted to invest in PIMCO Funds and establish a "long term relationship" with PIMCO. Based on the information conveyed to him by Corba, Treadway believed that Stern wanted "a long-term relationship" but that "it was possible" that he might engage in "occasional 'active trading' under certain market conditions"—specifically, that there would be certain periods when the market was choppy when the trading would be "pretty active" but that otherwise Stern's investments would have "more long-term investment characteristics." (Treadway R. 56.1 Response ¶¶ 13–14.) Moreover, Treadway claims he was told by Corba that limits would be put in place to prevent any harmful trading. Drawing every reasonable inference in favor of the non-movant, a rational fact finder could conclude that Treadway did not have an understanding of the full scope of the Canary arrangement when it was initially discussed with him by Corba.

Second, Treadway allowed the Canary relationship to continue over time, despite receiving information about Canary's trading that should have put him on notice that the trading may have conflicted with the PIMCO Funds' anti-market timing policies. Combined with his knowledge of the harms associated with market timing as evidenced by his self-professed vehement opposition to market timing, this evidence could easily lead a reasonable trier of fact to conclude that Treadway was guilty of an "egregious refusal to see the obvious, or to investigate the doubtful," *Novak*, 216 F.3d at 308, or that he "ignored obvious signs of fraud," *Id.* On the other hand, Treadway disputes the substance of what was conveyed to him (and that certain signs that the trading was disruptive, such as McKechnie's opposition to trading in the Innovation Fund, were conveyed to him at all) and further suggests that Corba deceived him by continually assuring him that Canary's frequent trades were an aberration that would soon subside into trading more characteristic of a long-term investor. Although whether Treadway should have relied on Corba's assurances raises another issue entirely,[22] drawing all inferences in favor of Treadway, it would not be unreasonable to infer that he was entitled to rely on these assurances.

A reasonable fact finder could infer that Treadway delayed terminating the Canary relationship until October in order to prevent adverse consequences to the funds, such as a lawsuit from Stern or tax consequences related to the timing of the merger of the Growth and Select Growth funds.

Of course, even if Treadway did have sufficient grounds to delay termination of

---

**22.** Treadway argues that in light of his belief that limits would be in place, that PEA, as the portfolio manager, could analyze trading results to monitor and prevent harm, and that

PEA has an incentive to prevent harm because portfolio managers are judged by the returns they earn for their investors, he was entitled to rely on Corba's assurances.

the Canary relationship, this would not necessarily relieve him of liability for the PIMCO Funds' misleading disclosures once he finally did become aware that the disclosures conflicted with Canary's actual trading. However, because the meaning of the Prospectus is in dispute, Treadway's scienter as to any misrepresentations cannot be determined on summary judgment. If the Prospectus did allow for market timing so long as the PIMCO Funds determined that no harm would occur to shareholders, then a genuine issue of fact exists as to whether Treadway's conduct was a highly unreasonable or extreme departure from the standard of care, given that Treadway has put forth evidence suggesting that he took steps to monitor and eliminate any harm—such as approving the relationship only with limits of three percent capacity in each fund, obtaining a promise from Corba to closely monitor the trading to ensure that it did not harm PIMCO Funds shareholders and to keep Stern's investment in cash if necessary so that if trading appeared to be active it could be liquidated quickly, agreeing that the trading would proceed only on a "trial basis," and instructing PAD to develop a "more precise and limiting definition" of round trips.

Treadway's scienter as to the quid pro quo is also in dispute. Treadway points to his own testimony suggesting that Corba did not make clear to him that the Select Growth Fund investment would be different from Canary's other investments, and that he did not know for certain of this investment until the summer of 2002.

Finally, if the SEC seeks to demonstrate scienter through motive and opportunity, material issues of fact prevent summary judgment on this issue. Treadway points to his push for redemption fees, which, if imposed, would have eliminated the trading and accordingly, part of his bonus. He also adds that the Canary trading accounted for only about three percent of his bonus, that he did not know what portion of his bonus was so attributable, and that Canary originally traded via exchanges, which did not count as sales for purposes of his bonus calculation. Therefore, triable issues of fact exist as to Treadway's motivation to commit the fraud.

### (ii) *Corba's Scienter*

According to the SEC, Corba's knowledge of the Canary arrangement is demonstrated by his negotiation of the Canary arrangement, including details such as allowing four round trips per month; his knowledge of the frequent trading from email notifications; and his knowledge of the $25 million placed into the Select Growth Fund, a fund that he managed and which placement doubled its size.

Corba, however, has moved for summary judgment on his lack of scienter. His arguments fall into two main categories. First, he argues that summary judgment is warranted because he had no knowledge of any conflict or "disjunction" between the Prospectus and Canary's trading. At most, Corba argues, the SEC can demonstrate only that he had knowledge of the arrangement and of Canary's trading, not that it conflicted with the Prospectus. Second, Corba argues that summary judgment is warranted because, given Treadway's approval of the relationship, it was not reckless for him to think that the Canary relationship was not problematic.

However, the Court finds that material issues of fact exist as to Corba's scienter on both counts. As to Corba's contention that he was not aware of any "disjunction" between the Prospectus and the Canary arrangement, several issues arise. First, although Corba states that he was not familiar with the "specific language" in the

exchange policy, he testified that he had "always been familiar with the spirit of it" (Corba Investigative Test. at 53:21–54:15; see SEC R. 56.1 Response ¶ 19); that he was "aware that they had a general policy of discouraging market timers" (Corba Investigative Test. at 70:25–71:1); that he was "aware that, as a firm, we discouraged market timing or we terminated some market timers" (*Id.* at 96:20–97:7); and that, when they were entering into the arrangement with Stern, he "knew that we were making an exception, but we were going to monitor it"· (Corba Investigative Test. at 69:1–19).

Second, although Corba states that he was not familiar with the specific mechanics of how PIMCO's exchange policy was implemented, it is not necessary for Corba to have knowledge of the exact mechanisms and procedures used in implementing the anti-market timing policy in order for him to understand that such mechanisms and procedures were in place and were carried out. Regardless, Treadway testified that Corba stated that Canary's actions had the potential to cause PIMCO to "freez[e]" its accounts, suggesting that he did have some familiarity with how the policy was enforced. (Treadway Investigative Test. at 73:24–74:5.) Third, Treadway testified that Corba informed him that Stern was interested in "active trading" that "could potentially run afoul" of the PIMCO Funds' market timing policies.

(*Id.*) This comment—although disputed by Corba—suggests that Corba did have knowledge of the anti-market timing stance of the Prospectus and that Canary's trading could violate the policy, and thus it could be reasonably inferred that Corba knew or was reckless in not knowing that Canary's trading potentially conflicted with that language. Fourth, Corba stated in an email to a Brean Murray broker that Canary's trading was the "most opportunistic but extreme form of market timing" that he had ever seen. (Corba May 17 Email.)[23] Finally, from his status as CEO of PEA, the investment sub-adviser where all of Canary's market timing and alleged "sticky asset" investments occurred, and portfolio manager for the PIMCO Growth and Select Growth funds, where Canary's trading took place, it can be reasonably inferred that Corba had or should have had knowledge of the policies governing the funds which he himself managed and for which he, as the CEO of PEA, provided investment oversight.[24]

As to Corba's contention that he was not reckless because he received approval from Treadway, the Court finds that material issues of fact preclude summary judgment on this issue. Although Corba points out that Treadway approved the Canary arrangement, and argues that since Treadway headed the companies responsible for drafting the Prospectus and implementing

---

**23.** Although Corba argues that this comment had "nothing to do with the Prospectus" and that it did not demonstrate concern about harm to shareholders, but rather, just "surprise at the short-term nature of Stern's trading," (Corba R. 56.1 Response ¶ 49) the Court finds that reasonable competing inferences can be drawn from this email, particularly when considered in combination with the rest of the record.

**24.** The Court notes in particular Corba's claim that he was "not familiar" with the specific language of the "exchange policy"

because his focus was on portfolio management. (Mem. of Kenneth W. Corba in Opp'n to Pl. Securities and Exchange Commission's Mot. for Summ. J., dated November 10, 2005, at 15.) The extent of his familiarity with PIMCO's market timing policies as expressed in the Prospectus, and whether, if he was not familiar, it was reckless for him to not be familiar with such policies governing the funds that he managed and that fell under the management of a company of which he was CEO, is an issue involving disputed issues of fact to be determined at trial.

the exchange policy, Corba he had no reason to believe the Canary relationship was incompatible with the Prospectus, the substance of what he disclosed to Treadway is, as already discussed, highly disputed. Moreover, even if Corba did inform Treadway that Stern wanted to actively trade and that there would be limits to monitor such trades, it can be reasonably inferred, from both the fact that he felt he needed Treadway's approval and his suggestion that there should be monitoring of the trades, that he knew that something might be wrong with the Canary arrangement. On this note, the Court observes that Corba's argument that he thought there was no risk of harm because he "reasonably thought that market timing in domestic equity funds could not work" (Corba SJ Mem. at 26) is belied by his simultaneous insistence that Canary's trading needed monitoring and limits.

Factual disputes also exist as to Corba's motive. That Stern's $25 million investment doubled the size of a fund that Corba managed suggests a motive, as do the fees generated by the arrangement. However, as already discussed, whether the $25 million investment and the others were linked is in dispute, as are the amount of fees and how much of those fees were paid to PEA. In addition, although Corba states that Stern made the ultimate decision to invest in the Select Growth Fund, and that such decision was made on the basis of investment merit, other evidence suggests that Corba was interested in having the investment placed into his particular fund. For example, a January 3, 2002 email from Cashwell to Goldberg states, "I spoke with Ken Corba and he said that he would like the $25mm in long term assets to be invested in the PIMCO Select Growth Fund Institutional share class." (Email from Ken Cashwell, dated Jan. 3, 2002, attached as Exhibit 7 to Schneir Decl.) [25]

Although summary judgment for Corba is not appropriate based on the above evidence, neither is summary judgment warranted for the SEC. Many of the facts on which a determination of scienter rests are in dispute—to name only a few, the substance of Corba's conversation with Treadway, the meaning of the Prospectus, and the extent of Corba's familiarity with the Prospectus—and thus must be assessed by the trier of fact.

### 2. Aiding and Abetting Liability

Section 20(e) of the Exchange Act, § 78t(e), and Section 9(d) of the Advisers Act, 15 U.S.C. § 80b–9(d), authorize the SEC to bring claims for aiding and abetting primary securities violations. Aiding and abetting liability consists of (1) existence of a securities violation by a primary wrongdoer; (2) knowledge of the violation by the aider and abettor; and (3) proof that the aider and abettor substantially assisted in the primary violation. See Armstrong, 699 F.2d at 91; PIMCO I, 341 F.Supp.2d at 467–68. The SEC charges Treadway and Corba with aiding and abetting (1) violations of Section 10(b) of the Exchange Act and Rule 10b–5 thereunder by PAFM, PEA, and PAD; and (2) primary violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b–6(1) & 80b–6(2), by PAFM and PEA. The Court cannot grant summary judgment as to Treadway's and Corba's

---

**25.** Treadway has also introduced facts that, while not relied upon by the SEC, are relevant to Corba's motive. Treadway has pointed out that Corba was interested in increasing the size of his Select Growth Fund so that it could be listed in the *Wall Street Journal;* Treadway also points to evidence suggesting that PEA gave advance information on PEA's portfolio holdings to Canary in an attempt to advance its relationship with Stern. Corba has denied knowledge of these disclosures.

aiding and abetting liability for any of these claims.

### (a) Primary Violations

### (i) Violations of Section 10(b) of the Exchange Act and Rule 10b–5 Thereunder by PAFM, PEA, and PAD

■ Material issues of fact exist as to whether PAFM, PEA, and PAD committed a primary violation of the securities laws under Section 10(b) and Rule 10b–5. Although the SEC states that there is no dispute that PAFM, PEA, and PAD provided timing capacity to Canary in exchange for long-term investments from which PAFM and PEA earned management fees, the type and extent of the capacity provided and the terms under which it was provided, as well as whether the arrangement consisted of an "exchange" of market timing capacity for long-term assets, is in fact strongly disputed, at least by Corba.[26] Second, even if it were not disputed that Canary was provided this capacity, the relevant inquiry is whether the failure to disclose this arrangement in the Prospectus and other disclosure documents rendered the Prospectus and those other documents materially misleading, and, as set forth above, both the meaning of the Prospectus and the ramifications of the arrangement upon the funds and shareholders (and thus whether the disclosures contained a material misrepresentation or omission) are heavily disputed.

■ Third, a primary violation under Section 10(b) and Rule 10b–5 requires scienter. Here, however, the SEC attempts to prove the scienter of PAFM, PAD, and PEA by imputing to those entities the scienter of Treadway and Corba. It is settled that the scienter of executives can be imputed to corporate entities. *See, e.g., SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1089 n. 3 (2d Cir.1972) (finding "ample evidence" to support district court's finding that executive "exercised blanket authority in the matter of the securities transactions" at issue and thus holding that the corporations are "corporate embodiments of [the executive] and his awareness of the securities laws violations are imputed to them") (citing *SEC v. N. Am. Research & Dev. Corp.,* 424 F.2d 63, 79 (2d Cir.1970), which held that "[s]ince the corporation here was little more than the personification of [its executives] and could take no action different from that which they dictated, there is no question but that the corporation also failed to exercise due diligence in ascertaining the truth of the statements contained in [the documents at issue]"); *SEC v. Ballesteros Franco,* 253 F.Supp.2d 720, 728–29 (S.D.N.Y.2003) (observing that to hold that a person's knowledge can be attributed to a corporation in connection with actions that person through his control causes the corporation to take is "consistent with the self-evident proposition that a corporation can act only through the actions of natural persons and that the

---

**26.** The SEC states that "[t]he settlement reached with the PIMCO entities resolved the Commission's allegations relating to this conduct." (Pl. Securities and Exchange Commission's Mem. of Law in Supp. of Its Mot. for Entry of Summ. J. Against Defs. Treadway and Corba, dated October 6, 2005, at 16). To the extent that the SEC is relying on the settlement with these PIMCO entities in support of its argument that a primary violation occurred, the SEC has not established a primary violation, as the terms of the administrative order make clear that PAFM, PAD, and PEA settled "without admitting or denying the findings" in the order and that the findings "[were] not binding on any other person or entity in this or any other proceeding." (*See Order Instituting Administrative and Cease–and–Desist Proceedings,* Exchange Act Release No. 50354 (Sept. 13, 2004) at 2, attached as Exhibit 3 to Declaration of Abigail K. Hemani, dated November 10, 2005.)

actions of its agents, acting within the scope of their agency, are attributed to the corporation"). Nonetheless, in this case genuine issues of material fact exist as to the scienter of Treadway and Corba. Thus, the SEC's summary judgment motion on the claims of aiding and abetting liability cannot be granted, for the primary violations that Treadway and Corba have been charged with having aided and abetted have not been established as a matter of law.

(ii) *Violations of Sections 206(1) and 206(2) of the Advisers Act by PAFM and PEA*

 Material issues of fact also exist as to whether PAFM and PEA committed primary violations of §§ 206(1) and 206(2) of the Advisers Act. Section 206(1) prohibits investment advisers from "employ[ing] any device, scheme, or artifice to defraud any client or prospective client;" § 206(2) prohibits investment advisers from "engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b–6(1) & (2). Section 206(1) requires fraudulent intent, while § 206(2) requires only negligence. *See PIMCO I*, 341 F.Supp.2d at 470 (citing *SEC v. Moran*, 922 F.Supp. 867, 896–97 (S.D.N.Y.1996)).

The extent of conduct subject to liability under the Advisers Act is broad. By enacting Section 206 of the Advisers Act, Congress "establishe[d] 'federal fiduciary standards' to govern the conduct of investment advisers." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 17, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). Section 206 "establishes a statutory fiduciary duty for investment advisers to act for the benefit of their clients, requiring advisers to exercise the utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients." *Moran*, 922 F.Supp. at 895–96 (citing *Transamerica*, 444 U.S. at 17, 100 S.Ct. 242; *Burks v. Lasker*, 441 U.S. 471, 482 n. 10, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979); *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 472 n. 11, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191–92, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963)). The Advisers Act "thus reflects a congressional recognition 'of the delicate fiduciary nature of an investment advisory relationship,' as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested." *Capital Gains*, 375 U.S. at 191–92, 84 S.Ct. 275.

The SEC charges that PAFM and PEA were investment advisers charged with managing the PIMCO Funds, and thus owed the board and shareholders fiduciary duties to act in their best interests, to exercise good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients. By giving Canary preferential market timing privileges, PAFM and PEA provided preferential treatment to one shareholder over and at the expense of others, thus violating the Advisers Act. In addition, the SEC alleges that PAFM's and PEA's failure to disclose the arrangement, including the "sticky assets," also violated the Advisers Act because this was information necessary for potential investors to evaluate the objectivity of the advice of those investment advisers.

Investment advisers do owe to the boards and shareholders of the funds they manage the highest fiduciary duties. *See, e.g., Transamerica*, 444 U.S. at 17, 100 S.Ct. 242; *Capital Gains*, 375 U.S. at 194,

84 S.Ct. 275. However, as explained above, the meaning of the disclosures and thus whether they were deceptive is in dispute, as is the issue of whether Canary was treated differently than other investors. Moreover, since the existence of a quid pro quo and of "sticky assets" are also in dispute, the Court cannot determine as a matter of law that PAFM and PEA withheld information necessary for potential investors to assess the objectivity of their investment advisers. Whether PAFM and PEA acted in the best interest of their clients turns on various disputed issues to be resolved at trial, such as whether the Canary arrangement existed in the form alleged by the SEC and thus put one client's interests ahead of another.

Finally, the mental state of PAFM and PEA cannot be determined at this time, as the SEC is relying on the mental states of Treadway and Corba, which have not been established as a matter of law.

### (b) Knowledge of the Primary Violations

To hold Treadway and Corba liable for aiding and abetting, the SEC must show that Treadway and Corba knew of or were reckless with respect to any primary violations. As the Court explained in *PIMCO I*, "if the alleged aider and abettor owes a fiduciary duty to the [defrauded party], recklessness is enough" to satisfy the knowledge element of aiding and abetting liability. *Armstrong*, 699 F.2d at 91 (citing *IIT v. Cornfeld*, 619 F.2d 909, 923 (2d Cir.1980)).

As discussed above, there are material issues in dispute regarding Corba's and Treadway's knowledge of any primary violations. With respect to a Section 10(b) or Rule 10b-5 violation, Corba disclaims any knowledge of the content of that portion of the Prospectus in which the PIMCO Funds market timing policy was set out,

and Treadway disclaims sufficient knowledge of the Canary arrangement to know that it served to make the Prospectus misleading. Both dispute whether they were reckless in not knowing of the materially misleading disjunction between the Prospectus and the Canary arrangement, if in fact there was any such disjunction.

With respect to the aiding and abetting claims under the Advisers Act, Treadway disputes knowledge that the Canary arrangement was potentially harmful to PIMCO Funds or its investors or that it favored Canary over other investors. Although a reasonable fact finder could conclude that Treadway and/or Corba had the requisite knowledge or recklessness, this is not the only reasonable conclusion to be drawn from the parties' submissions. Therefore the Court cannot grant summary judgment on this issue.

### (c) Substantial Assistance

In order to make out a claim for aiding and abetting, the SEC must show that Corba and Treadway provided substantial assistance to the primary violators. The aider and abettor's substantial assistance must be a proximate cause of the primary violation. *See Armstrong*, 699 F.2d at 92 (citing *Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir.1979)). Thus, mere awareness and approval of the primary violation is insufficient to make out a claim for substantial assistance. *Id.* Inaction on the part of an aider and abettor is not sufficient to satisfy the substantial assistance prong of the standard unless "it was designed intentionally to aid the primary fraud or it was in conscious or reckless violation of a duty to act." *Id.* at 91 (citing *IIT*, 619 F.2d at 925–27).

The SEC argues that Treadway's substantial assistance to the primary violators consisted of his approval of the Canary

relationship, specifically the market timing arrangement therein; knowledge of Canary's frequent trading activities; oversight of PAD's market timing monitoring; failure to disclose the Canary arrangement to the Board; and filing of PIMCO Funds' registration statements with the SEC.

With respect to Corba, the SEC argues that he provided substantial assistance by negotiating the Canary arrangement and deciding that PEA would move forward with it, securing the $25 million in sticky assets into a fund he managed, his extensive knowledge of Canary's market timing activities, and his failure to correct his own funds' market timing-related disclosures when the Canary relationship rendered them materially misleading.

Whether or not these activities would comprise substantial assistance, as discussed above, most if not all of the SEC's contentions are in dispute. Treadway alleges that he was misled by Corba and others as to the real nature of the Canary relationship, and that he terminated Canary's frequent trading promptly after he became aware of the true nature of the Canary arrangement. Corba argues that he had no duty to correct others' failure to disclose the Canary arrangement. The other factual disputes with respect to Corba go not to whether he provided substantial assistance—for instance he does not dispute that he played a substantial role in negotiating the Canary relationship—but to whether there were any primary violations that his actions could have substantially assisted. Moreover, the SEC must also prove that Treadway's and Corba's actions caused the primary violations and that any failure to act was in conscious or reckless violation of a fiduciary duty or was taken intentionally to aid the primary violation.

### 3. Section 17(a) of the Securities Act

The SEC has also moved for summary judgment against Treadway and Corba on the basis of its claims under Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) ("Section 17(a)"). Corba has similarly moved for summary judgment on these claims. Essentially the same elements are required to establish a violation under Section 17(a) as under Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, except that no showing of scienter is required under subsections (a)(2) or (a)(3) of Section 17(a). *See Monarch,* 192 F.3d at 308; *PIMCO I,* 341 F.Supp.2d at 469.

Thus, for the reasons set forth in the sections above discussing material issues of fact as regards material misstatements and omissions, the Court denies summary judgment as to the Section 17(a) claims.

### 4. Section 34(a) of the Investment Company Act

Section 34(a) of the Investment Company Act, 15 U.S.C. § 80a–33(b) ("Section 34(a)"), prohibits material misrepresentations or omissions in terms similar to Section 10(b) of the Exchange Act. *See PIMCO I,* 341 F.Supp.2d at 471. Thus, the Court cannot grant summary judgment as to the Section 34(a) claims, as material issues of fact exist, as detailed extensively above, as to the material misstatements and omissions.

### 5. Section 36(a) of the Investment Company Act

The SEC alleges that Corba and Treadway violated Section 36(a) of the Investment Company Act ("Section 36(a)"), which imposes liability on officers, directors, members of advisory boards, investment advisers, depositors, or principal underwriters of a registered investment company for "any act or practice constituting breach of fiduciary duty involving per-

sonal misconduct" with respect to that investment company. 15 U.S.C. § 80a–35(a). As discussed in *PIMCO I*, the SEC need not allege fraud or self-dealing to prevail on this claim; instead, it must demonstrate an accepted breach of fiduciary duty via affirmative acts or "in appropriate cases, nonfeasance of duty or abdication of responsibility." 341 F.Supp.2d at 471.

An investment advisor of an investment company is defined as:

(A) any person (other than a bona fide officer, director, trustee, member of an advisory board, or employee of such company, as such) who pursuant to contract with such company regularly furnishes advice to such company with respect to the desirability of investing in, purchasing or selling securities or other property, or is empowered to determine what securities or other property shall be purchased or sold by such company, and

(B) any other person who pursuant to contract with a person described in clause (A) of this paragraph regularly performs substantially all of the duties undertaken by such person described in said clause (A).

15 U.S.C. § 80a–2(a)(20).

■ Before addressing the parties' arguments about whether relevant factual disputes exist with respect to the SEC's Section 36(a) claims, the Court pauses to address legal issues that will frame that discussion and will also guide factual questions for trial. First, there is a dispute as to the meaning of the phrase "involving personal misconduct" as used in Section 36(a), and for that matter, what fiduciary duties are owed under the provision. Corba argues that a Section 36(a) violation requires proof of "misconduct that involves self-dealing by investment company and other insiders." *Prescott v. Allstate Life Ins. Co.,* 341 F. Supp 2d 1023, 1029

(N.D.Ill.2004). This Court has already explained in *PIMCO I* that a Section 36(a) violation need not involve self-dealing, *see* 341 F.Supp.2d at 471, but the parties' continued pressing of the matter suggests that further explanation is warranted.

Courts are divided over what it means for a breach of fiduciary duty to involve personal misconduct under Section 36(a); some courts hold that the language was used to limit Section 36(a) claims to those alleging self-dealing, while others find that Congress had broader intentions. *Compare Prescott,* 341 F.Supp.2d at 1029 *and In re Nuveen Fund Litig.,* No. 94 C 360, 1996 WL 328006, at *11 (N.D.Ill. June 11, 1996) (interpreting "personal misconduct" "to refer to misconduct that involves self-dealing by investment company or other insiders"), *with Young v. Nationwide Life Ins. Co.,* 2 F.Supp.2d 914, 927 (S.D.Tex. 1998) (refusing "to limit § 36(a)'s scope to only those violations that involve self-dealing or personal impropriety"), *Strougo v. Scudder, Stevens & Clark, Inc.,* 964 F.Supp. 783, 799 (S.D.N.Y.1997) (noting that "[t]he legislative history [of Section 36(a)] does not indicate an intention to require allegations of fraud or self-dealing.") *and Seidel v. Lee,* N. 94–422–JJF, 1996 WL 903947, at *8 (D.Del. Aug.16, 1996) (finding that any direct breach of fiduciary duty "is a form of personal misconduct."). Legislative history provides some helpful guidance. As related aptly in *Strougo,*

Section 36(a) formerly permitted suits only if they were based upon "gross misconduct or abuse of trust." In 1967, the SEC proposed that the standard be lowered to a simple "breach of fiduciary duty." The Senate rejected this proposal, noting that the lower standard would permit SEC sanctions "based on 'nothing more than a difference of opinion about the most debatable management

problems." ' S. 1659, 90th Cong., 1st Sess. § 20 (1967), Part I at 308, *reprinted in Mutual Fund Legislation of 1967: Hearings on S. 1659 before the Senate Comm. on Banking & Currency*, 90th Cong., 1st Sess. (1967).

The SEC's proposed bill did not pass, and when reintroduced in the next Congress it contained the additional words "involving personal misconduct." In reporting the revised bill, the Senate committee stated:

> The amended section [36(a)] will enable the Commission to move against officers, directors, and advisory board members of an investment company and its investment advisers or principal underwriters if they engage in conduct which violates prevailing standards of fiduciary duty involving personal misconduct.
>
> This section is intended to deal only with such violations committed by individuals. It is not intended to provide a basis for the Commission to undertake a general revision of the practices or structures of the investment company industry. On the other hand, your committee does not intend to limit the Commission under this section to situations where actual intent to violate the law can be shown or to acts of affirmative misconduct. In appropriate cases, nonfeasance of duty or abdication of responsibility would constitute a breach of fiduciary duty involving personal misconduct.

S. Rep. at 34, S. 3724, 90th Cong., 2d Sess., § 20. (July 1, 1968). *Strougo*, 964 F.Supp. at 799.

Thus, Congress added the phrase "involving personal misconduct" to limit the scope of the phrase "breach of fiduciary duty." However, the legislative history suggests that Congress inserted the additional phrase to avoid providing "a basis for the Commission to undertake a general revision of the practices or structures of the investment company industry," S. Rep. at 34, not to limit the class of breaches of fiduciary duties to those involving self-dealing. The language from the Senate Report quoted above further suggests that the breaches of fiduciary duty Congress meant to reach are not limited to those involving self-dealing, fraud, or conflicts of interest, given that "nonfeasance of duty" and "abdication of responsibility" can also serve as violations of Section 36(a). *See Young*, 2 F.Supp.2d at 927.

One commentator has suggested that "involving personal misconduct" should be interpreted to incorporate

> the substance of the business-judgment rule—an enumerated party under section 36(a) is not liable for what turns out to be a bad business decision as long as the party made the decision "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."

William K. Sjostrom, Jr., *Tapping the Reservoir: Mutual Fund Litigation Under Section 36(a) of the Investment Company Act of 1940*, 54 U. Kan. L.Rev. 251, 302 (2005) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984)).

One court in this district has found that the business judgment rule applies to claims under Section 36(b) of the Investment Company Act, which imposes a fiduciary duty with respect to investment advisers' compensation, against an investment company's independent directors. *See Reserve Mgmt. Corp. v. Anchor Daily Income Fund, Inc.*, 459 F.Supp. 597, 611 (S.D.N.Y.1978). Although Sjostrom's effort to fill the interpretive gap is well-intentioned and well-argued, it fails to account for the fact that the benefit of the business judgment rule is ordinarily extended only to disinterested and indepen-

dent parties. *See* Dennis J. Block et al., *The Business Judgment Rule: Fiduciary Duties of Corporate Directors* 39 (5th ed.1998). Although it may be appropriate to afford disinterested investment company directors the benefit of the business judgment rule in deciding Section 36(a) claims, it would contravene Congress's intention to do so with respect to investment advisers, an important enumerated group of potential defendants to Section 36(a) claims that extends to the defendants here. As the Supreme Court explained, in enacting the Investment Company Act,

> Congress was concerned about the potential for abuse inherent in the structure of investment companies. A mutual fund is a pool of assets, consisting primarily of portfolio securities, and belonging to the individual investors holding shares in the fund. *Tannenbaum v. Zeller*, 552 F.2d 402, 405 (2d Cir.1977). Congress was concerned because
>
>> [m]utual funds, with rare exception, are not operated by their own employees. Most funds are formed, sold, and managed by external organizations, [called 'investment advisers,'] that are separately owned and operated.... The advisers select the funds' investments and operate their businesses.... Since a typical fund is organized by its investment adviser which provides it with almost all management services ... a mutual fund cannot, as a practical matter sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy.

S. Rep. No. 91–184, p. 5 (1969); U.S.Code Cong. & Admin. News 1970, pp. 4897, 4901. As a consequence, "[t]he relationship between investment advisers and mutual funds is fraught with potential conflicts of interest," *Galfand v. Chestnutt Corp.*, 545 F.2d 807, 808 (2d Cir.1976).

*Burks*, 441 U.S. at 480–81, 99 S.Ct. 1831.

Although the exact meaning of the phrase "involving personal misconduct" may vex parties and courts in the future, it need not occupy the Court further here. The SEC has alleged that Corba and Treadway have breached their fiduciary duties by knowingly placing the interests of one investor, Canary, above those of other investors, and by placing their own interests and the interests of the investment adviser and sub-adviser above the interests of the funds and their shareholders. As the Court held in *PIMCO I*, Section 36(a) is not limited to allegations of self-dealing. When Congress used the phrase "breach of fiduciary duty," it is presumed to have incorporated the common law meaning of those words. *See Beck v. Prupis*, 529 U.S. 494, 500–01, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000) ("when Congress uses language with a settled meaning at common law, Congress presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind") (citation and internal quotation marks omitted). Furthermore, the Second Circuit has noted that Section 36(a) imposes fiduciary duties "at least as stringent as those at common law." *Tannenbaum v. Zeller*, 552 F.2d 402, 416 n. 20 (2d Cir.1977) (citing *Galfand*, 545 F.2d at 811). The range of fiduciary duties, based either on misfeasance or nonfeasance, reachable under Section 36(a) is certainly broad enough to encompass the SEC's allegations herein.

*(a) Treadway*

■ As Chair of the Board of Trustees of PIMCO Funds, Treadway was a di-

rector of a registered investment company, thus is subject to the strictures of Section 36(a). This point is not in dispute. Treadway was, of course, an interested director, as CEO and managing director of PAFM, the investment adviser. The Court notes that Section 36(a) also applies to Treadway as an investment adviser. The SEC argues that, in approving and allowing the Canary arrangement, Treadway placed Canary's interests ahead of the interests of other PIMCO Funds investors, thereby breaching a fiduciary duty to those other investors. *See PIMCO II*, 354 F.Supp.2d at 314. The SEC also points out that the Canary arrangement resulted in fees from the timing assets and long-term assets placed under management with PAFM and PEA, and that Treadway's bonus was based in part on the sales. The Court further notes that Treadway could be liable for a breach of fiduciary duty based on the fees generated for the investment adviser. The SEC argues that even if Treadway lacked specific knowledge of the "sticky assets" at the time he authorized the Canary arrangement, the knowledge he did have is sufficient to preclude an issue of material fact regarding his liability under § 36(a), as it is undisputed that he had some knowledge about Canary's long-term investment into the Select Growth Fund, an investment that, the SEC avers, benefitted Treadway to the detriment of PIMCO Funds shareholders.

In turn, Treadway argues that there remains a factual dispute over whether he committed an "accepted breach of fiduciary duty." *PIMCO I*, 341 F.Supp.2d at 471. According to Treadway, this dispute turns on whether Treadway knowingly approved the Canary arrangement, whether Canary's interests were actually put ahead of those of other PIMCO Funds investors in light of the discretionary meaning of the Prospectus, whether the trading was potentially harmful, whether he satisfied his duty through his actions to limit, monitor, and terminate market timing, whether lack of actual harm demonstrates his fulfillment of his fiduciary duty, and whether he allowed the trading for self-interested reasons, as other evidence shows that he was trying to decrease market timing and fees under the Canary arrangement were computed on the same basis as that on all other investments in PIMCO Funds. As discussed above, a breach of fiduciary duty in this context need not be based on self-dealing. The Court notes further that whether Treadway breached his fiduciary duty depends also on whether he adequately informed himself of the Canary arrangement in sufficient detail, given that what he did know may have triggered a duty to investigate.

Treadway argues that liability based on nonfeasance or abdication of duty is disputed as well. He avers that he fulfilled any duty to investigate by speaking to Corba and PAD several times about Stern's trading, relying on Corba to ensure that no harm would befall other investors, and terminating the trading when he determined that Corba's assurances were not in fact true. Whether Treadway had a duty to investigate the Canary arrangement further depends on what he knew about it and whether it was reasonable for him to rely on what Corba and others told him about the arrangement, circumstances about which there is a factual dispute.

In addition, there exist factual disputes regarding whether liability may be grounded on non-disclosure to the Board. Treadway argues that the non-disclosure did not breach any fiduciary duty, because the Board's function is to supervise, direct and control overall business policies, not to manage day-to-day fund activities. However, the SEC maintains, and Treadway at least partially agrees, that the Canary arrangement was unusual, thereby potential-

ly triggering a duty to inform the Board. As CEO and managing director of PAFM, Treadway acted as an agent of PIMCO Funds, thereby owing a duty to PIMCO Funds to give information "relevant to affairs entrusted to him and which ... the principal would desire to have...." Restatement (Second) of Agency § 381 (1958). Thus a factual issue remains whether Treadway abdicated his duty by failing to inform the Board of the Canary arrangement. Whether Treadway had such a duty depends in turn on how much Treadway knew about the Canary arrangement and when, a matter the parties strongly dispute.

There exist factual disputes regarding whether Treadway committed a breach of fiduciary duty involving personal misconduct as required for liability under § 36(a). The parties dispute Treadway's level of knowledge about the Canary arrangement, when he knew it, whether actions he took to discourage market timing served to fulfill his fiduciary duty, exactly what and how much Corba told him about the Canary arrangement and whether it was reasonable for him to rely on those representations for purposes of fulfilling his fiduciary duty. There exist factual disputes regarding whether the Canary arrangement was potentially or actually harmful to other investors, and this dispute may also need to be resolved in determining whether Treadway breached the fiduciary duties he owed to PIMCO Funds and its investors.

*(b) Corba*

▇▇▇ Corba argues that he is not subject to liability under Section 36(a) because he is neither an officer nor an investment adviser as defined by the Investment Company Act. As Corba points out, he was an officer of PEA, the investment adviser, and not of PIMCO Funds, the investment

company. However, Corba is subject to Section 36(a) liability as an investment adviser.

Although the Court has already addressed this issue, see *PIMCO I* at 472, it merits some further discussion. Specifically, Corba argues that he cannot be considered an investment adviser to PIMCO Funds because he was not acting pursuant to a contract with PIMCO Funds. However, as discussed above, the Investment Advisory Agreement and the Prospectus specifically allowed PAFM to delegate investment advisory functions, in full or in part, to sub-advisers, in some instances without approval of the shareholders which would otherwise be required under another section of the Investment Company Act. PEA was one such sub-adviser. In this sense, the sub-advisers, including PEA, provided investment advice to PIMCO Funds pursuant to the Investment Advisory Agreement. To accept Corba's hyper-technical argument, which would absolve sub-advisers of liability under Section 36(a), would subvert the intent of Congress to limit "the potential for abuse inherent in the structure of investment companies," *Burks*, 441 U.S. at 480, 99 S.Ct. 1831, which Congress carried out by regulating the relationship between investment companies and those who control and execute their daily operations.

In addition, Corba can be held liable as an investment adviser pursuant to Subsection B of the Investment Company Act definition. Corba argues that PEA did not undertake "substantially all of the duties undertaken" by PAFM pursuant to the Investment Advisory Agreement because PEA provided investment advice to only a few of the dozens of funds that comprise PIMCO Funds. However, Corba's argument misses the mark. The Investment Company Act's definition of investment adviser speaks of substantially all of the

*duties,* not substantially all of the *clients.* It is undisputed that PEA, through Corba and others, provided substantially all investment advisory services to several of the PIMCO funds, including those directly involved in the Canary relationship, subject to the oversight of PAFM and PIMCO Funds' Board of Trustees.

Further, Corba argues that the statute does not apply to him individually because he himself was not acting pursuant to a contract with PIMCO Funds. This argument too is unavailing, as an entity such as PEA can only act through natural persons. As the Court pointed out in *PIMCO I,* "Corba could be considered an investment adviser covered by Section 36(a), both as CEO of PEA, a registered investment adviser to certain of the PIMCO Funds, or as portfolio manager for two of the mutual funds that were directly involved in the alleged market timing scheme." *PIMCO I* at 472. In fact, parties in other Section 36(a) cases have argued (albeit unsuccessfully) that the phrase "personal misconduct" suggests that § 36(a) applies only to individuals, and not to entities. *See In re Nuveen Fund Litig.,* 1996 WL 328006, at *10.

### 6. *Remedies*

In light of the substantial number of material issues of fact precluding summary judgment for any party, the Court does not decide at this time the various issues of remedies that the instant motions present.

### IV. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion for summary judgment (Docket No. 99) of plaintiff the Securities and Exchange Commission is DENIED; and it is further

**ORDERED** that the motion for summary judgment (Docket No. 93) of defendant Kenneth Corba ("Corba") is denied; and it is finally

**ORDERED** that Corba's motion to strike the Declaration of Aaron Kohler (Docket No. 114) is DENIED.

**SO ORDERED.**